In the Matter of Dennis
MUSURLIAN, Debtor.

Michael E. KEPLER, Trustee, Plaintiff,

v.

William OLSON, Dennis Musurlian,
Ruth Musurlian, Scott Musurlian
and June F. Anderson, Defendants.

Adv. No. 88–0022–7.

United States Bankruptcy Court,
W.D. Wisconsin.

March 3, 1989.

Robert Michelson, Hartig, Bjelajac, Michelson & Kivlin, Racine, Wis., for defendants.

Michael E. Kepler, Madison, Wis., trustee.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

This adversary proceeding arises in the chapter 7 bankruptcy filed by Dennis Musurlian on December 27, 1985. Mr. Musurlian's case is a bramble bush of dishonesty and dissembling, the present avoidance action being but one ill-formed shoot of its diseased root. The defendant, William Olson, has been caught in this thicket as an unwitting dupe, or, at worst, a poorly compensated accessory. The trustee seeks to extract approximately $54,000.00 as atonement for Mr. Olson's apparent venality.

Prior to his bankruptcy Mr. Musurlian owned a service station. Mr. Olson had facilitated its purchase some years earlier by lending Mr. Musurlian the down payment. The parties had fairly extensive business dealings from that time until Mr. Musurlian sold the station. At the time of Mr. Musurlian's bankruptcy, Mr. Olson held a mortgage on the station, securing a debt which had been paid down to about $2,000.00. Mr. Olson received notice of the bankruptcy.

Mr. Musurlian had knowingly and fraudulently failed to schedule or disclose his interest in the service station which, nonetheless, passed into his bankruptcy estate. On May 16, 1986, Mr. Musurlian received a discharge from his debts which was thereafter revoked in November of 1987. After receiving the discharge, but before its revocation, Mr. Musurlian decided to sell the service station. The sale was closed on May 1, 1987.

A few days prior to the closing, Mr. Musurlian had contacted Mr. Olson to notify him of the upcoming closing. Whether Mr. Musurlian informed Mr. Olson at that time of the intended disposition of the sale proceeds is unclear. Mr. Olson strenuously denied any knowledge of or participation in a scheme to channel the sale proceeds through him to Mr. Musurlian. Mr. Musurlian also denied, though not without some equivocation,[1] having told Mr. Olson that he would receive a check for an amount more than he was owed.

Mr. Musurlian and Mr. Olson rode together to the closing, although Mr. Olson testified that he attended on his own initiative, rather than at Mr. Musurlian's request. Mr. Olson's stated reason for attending the closing was to execute a satisfaction of his mortgage.

When checks were disbursed by the bank officer conducting the closing, Mr. Olson was handed a check for $54,318.88, a sum considerably more than was then owing to him. The check was drawn on the account of Chris Peterson, the purchaser. Both Mr. Musurlian and Mr. Olson testified that Mr. Olson did not register any objection to the delivery of this check to him. Mr. Olson testified that he gave some verbal or nonverbal indication of surprise and that he exchanged glances with Mr. Musurlian, who assured him in some manner that he should hold the check. Mr. Musurlian testified that he verbally directed Mr. Olson to hold the check without protesting.

As to Mr. Olson's reasons for not voicing an objection, Mr. Olson testified that he felt that such a reaction might jeopardize the deal. He testified that he assumed Mr. Musurlian had a reason for the arrangement which was not, necessarily, less than legitimate. Additionally, Mr. Musurlian's (verbal or nonverbal) assurances, induced him to believe that Mr. Musurlian wanted him to hold the check. When queried if he felt Mr. Musurlian's bankruptcy had any-

---

1. At one point, Mr. Musurlian testified that he told Mr. Olson that he would be getting a check at the closing. Mr. Musurlian then recanted, saying that he told Mr. Olson that he would not be getting a check at the closing.

thing to do with the transaction, Mr. Olson testified that he had believed that Mr. Musurlian's bankruptcy was concluded.

Mr. Musurlian's testimony establishes that either Mr. Musurlian or his attorney instructed the closing officer to transfer the sale proceeds to Mr. Olson.[2] Mr. Musurlian's motive for so structuring the transaction was not fully investigated at the trial. Mr. Olson's opinion, reached after a few days reflection subsequent to the closing, was that Mr. Musurlian was attempting to hide the capital gain realized from the transaction.

After the closing, Mr. Olson and Mr. Musurlian went outside. There Mr. Olson questioned Mr. Musurlian about the check. Mr. Musurlian explained that there had been a mistake, and that Mr. Olson should simply indorse the check over to him. This Mr. Olson promptly did, and then Mr. Musurlian paid Mr. Olson by personal check the amount that was actually owed to him.

The parties have agreed that the delivery of the $54,318.88, except for the $1,762.00 due Olson, was an unauthorized transfer of property of the bankruptcy estate. It is, therefore, a voidable postpetition transfer under section 549. The parties disagree over whether the amount of this transfer can be recovered from Mr. Olson.

Section 550(a)(1) provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) *the initial transferee of such transfer* or the entity for whose benefit such transfer was made.

11 U.S.C. § 550(a)(1) (emphasis supplied). The burden of proof is not specifically assigned by the statute, *see In re Farmer's Market,* 22 B.R. 71, 76 (9th Cir. BAP 1982), and in the absence of any other provision, the trustee has the burden of proving each element for recovery.

The parties apparently agree that in a "literal" sense Mr. Olson is an "initial transferee" of the proceeds from the sale of the service station. Mr. Olson points out, and the trustee acknowledges, that such a "literal" interpretation of "initial transferee" is not required by the case law. Analysis of the proper construction of that term and its application to the facts must begin with the Seventh Circuit's recent decision in *Bonded Financial Services v. European American Bank,* 838 F.2d 890 (7th Cir.1988), which thoroughly addresses section 550(a)(1).

In *Bonded Financial,* a currency exchange company fraudulently conveyed $200,000.00 to one of its principals, Mr. Ryan, in the form of a check made payable to the order of Mr. Ryan's bank, and directed the bank to deposit the check into Mr. Ryan's account. The bank followed these instructions. At that time, the bank was owed approximately $655,000.00 by Mr. Ryan. The debt, however, was fully secured and not in arrears. Ten days after the $200,000.00 check had been deposited in Mr. Ryan's account, Mr. Ryan instructed the bank to debit his account by $200,-000.00 as repayment of the loan. Soon thereafter the currency exchange company filed bankruptcy.

The trustee in the bankruptcy case then sued the bank to recover the amount of the transfer under section 550(a)(1), arguing that the bank was an "initial transferee." In reaching the conclusion that the bank was not an "initial transferee" under section 550(a)(1), Judge Easterbrook stated:

Although the Bankruptcy Code does not define 'transferee,' and there is no legislative history on the point, we think the minimum requirement of status as a 'transferee' is dominion over the money

---

**2.** In a prior deposition, Mr. Musurlian stated that he was surprised when the sale proceeds were given to Mr. Olson. This statement is in conflict with Mr. Musurlian's testimony at the trial to the effect that he had orchestrated the check disbursement arrangement. At trial, he stated that he had told his attorney that Mr. Olson was owed the entire balance due at the closing, and that he did so because he was embarrassed to admit that he had substantial debts which he intended to pay from the sale proceeds.

or other asset, the right to put the money to one's own purposes.

*Id.* at 895.

Our threshold inquiry is, therefore, whether Mr. Olson acquired "dominion" over the proceeds from the sale. If not, the trustee must look elsewhere for recovery. Viewed from every angle, however, it appears that the *Bonded Financial* "minimum requirement" is satisfied.

The sale proceeds were put directly into the physical control of Mr. Olson with no instructions to tender them to Mr. Musurlian or any other party. On this point, the case is distinguishable from *Bonded Financial.* In both cases the check was made payable solely to the order of the recipient; however, in *Bonded Financial,* the transferor attached a note to the check directing the bank to "deposit this check into Mike [Ryan]'s account." Mr. Olson was given no directions and clearly had the discretion to deal with the asset transferred.

Further, there is no evidence whatsoever that Mr. Olson was acting as the agent for the transferor (whether that entity is considered to be the purchaser or the drawee bank). Likewise, there is no evidence that the transferor dealt with Mr. Olson as an agent for Mr. Musurlian. *Compare Robinson v. Home Savings of America (In re Concord Senior Housing Foundation),* 94 B.R. 180, 183 (Bankr.C.D.Cal.1988) (under *Bonded Financial* test, agent for debtor did not exercise control or dominion of funds transferred from debtor's bankruptcy estate into agent's bank account until agent pledged those funds for its own benefit); *In re Moskowitz,* 85 B.R. 8, 11 (Bankr.E.D.N.Y.1988) (title company acting as debtor's agent for purposes of paying off liens prior in connection with debtors' unauthorized postpetition sale of encumbered property held not be an "initial transferee").

Mr. Olson had a legal, if not equitable, right to put the funds to his own use. Since the cashier's check was a negotiable instrument, *see* WIS.STATS. § 403.104(1), and since it was made payable to Mr. Olson's order alone, *compare* WIS.STATS.

§ 403.116 (instruments made payable to order of two or more persons), he could enforce payment of it in his own name, *see* WIS.STATS. § 403.301. Again, the case is distinguishable from *Bonded Financial* in that there were no restrictions on Mr. Olson's disposition of the check. *Compare Bonded Financial,* 838 F.2d at 893 ("Under the law of contracts, the Bank had to follow the instructions that came with the check. The Uniform Commercial Code treats such instructions as binding to the extent any contract binds (see UCC § 3–119)."). The fact that Mr. Musurlian owed Mr. Olson $1,762.00 when the check was delivered to him also distinguishes this case from *Bonded Financial.* There, the Bank's loan was fully secured and not in arrears, thus "the bank did not even acquire a valuable right to offset its loan against the funds in [Mr. Ryan's] account." *Id.*

From the perspective of Mr. Musurlian, the third party in this triangle and the ultimate transferee of the check, Mr. Olson had dominion over the check. Mr. Olson was not acting as Mr. Musurlian's agent. *Compare Bonded Financial,* 838 F.2d at 895 ("When A gives a check to B as agent for C, then C is the 'initial transferee;' the agent may be disregarded."). Once the check was in Mr. Olson's hands, Mr. Musurlian was powerless to prevent Mr. Olson from cashing it or negotiating it to a third party. Indeed, Mr. Musurlian could only request that Mr. Olson indorse the check over to him.

Although Mr. Olson satisfies the "minimum requirement" for status as a "transferee," *Bonded Financial* also directs the court to consider the liability of a party under section 550(a)(1) in the context of the functional purposes of the section under which the transfer was avoided. *Bonded Financial,* 838 F.2d at 893. In that case, the transfer was avoided under section 548 as a fraudulent conveyance. The court identified the function of fraudulent conveyance law as "protect[ing] creditors from last minute diminutions of the pool of assets in which they have interests." *Id.* at 892. As a result of this protection credi-

tors are freed from burdensome costs of monitoring their debtors. *Id.* The court then pointed out that the Bankruptcy Code imposes the burden of inquiry as to the voidability of transfers on the "initial transferee" under section 550(a)(1). *Id.* This party's proximity to the transfer makes him "the best monitor." *Id.*

In our case, the transfer has been avoided under section 549(a). The function of this section is the postpetition equivalent of section 548: to protect the bankruptcy estate from diminution by the unauthorized transfer of estate property. And, as one court has noted, "[t]he Code, through section 549, seeks to preserve the bankrupt's estate even if such preservation is at the expense of some transferees." *Seaberg Precision Rebuilding Corp. v. United States Machine Tools, Inc. (In re United States Machine Tools, Inc.),* 38 B.R. 984, 986 (D.Conn.1983). Because of the narrowness of the exceptions to avoidability under section 549, *see* L. King, 4 *Collier on Bankruptcy* ¶ 549.02 at 549-6 (15th ed. 1988), the loss occasioned by the wrongful transfer of assets out of the estate will often fall upon an innocent party. *See Lake v. New York Life Insurance Co.,* 218 F.2d 394, 399 (4th Cir.1955) (commenting on avoidance of postpetition transfers under the Bankruptcy Act).

Consideration of the function of section 549 reinforces the conclusion that Mr. Olson is an "initial transferee" within the meaning of section 550(a)(1). Under the facts of this case, Mr. Olson was the "best monitor" of the transaction in question. First, Mr. Olson had notice of the bankruptcy case. *See* L. King, 4B *Collier on Bankruptcy* ¶ 70.67[1] at 743 (14th ed. 1978) ("Subject to the exceptions thus created [by predecessor to section 549] ... the bankruptcy petition is still a *caveat* and persons dealing with the bankrupt thereafter do so at their peril."). Second, under any interpretation of the facts surrounding the closing, Mr. Olson had notice that the transaction was "not right." *See Huffman v. Commerce Security Corp. (In re Harbour),* 845 F.2d 1254, 1258 (4th Cir.1988) (transferee of avoidable transfer who "aggressively ignored facts which would have put her on notice that she should investigate ... facially suspect transactions" held to be an "initial transferee"). By his own admission, if Mr. Olson had objected to the transfer of the check to him, the transaction might not have occurred.

This case is distinguishable from the "mere conduit" cases upon which Mr. Olson relies. In those cases the recipient of the transfer was a commercial entity performing duties with respect to the transfer in the ordinary course of business. *See Bonded Financial, supra; Metsch v. First Alabama Bank of Mobile (In re Colombian Coffee Co., Inc. I),* 59 B.R. 643 (Bankr. S.D.Fla.1986) *aff'd* 75 B.R. 177 (S.D.Fla. 1987). *See also Nordberg v. Societe Generale (In re Chase and Sanborn Corp.),* 848 F.2d 1196 (11th Cir.1988). In contrast to Mr. Olson, the recipients in those cases had no reason to investigate the transaction to which they were made a party. *See Bonded Financial,* 838 F.2d at 894; *Chase and Sanborn,* 848 F.2d at 1201-02; *Columbian Coffee I,* 59 B.R. at 645. Moreover, imposing the costs of a general duty to inquire upon such commercial entities would ultimately inure to the detriment of other parties involved in commercial transactions without significantly increasing the protection of creditors. *Bonded Financial,* 838 F.2d at 893 ("Exposing financial intermediaries ... to the risk of disgorging a 'fraudulent conveyance' in such circumstances would lead them to take precautions, the costs of which would fall on solvent customers without significantly increasing the protection of creditors."). Where an individual was personally involved in the business affairs of the debtor and dealt directly with the debtor at the time the individual received an avoidable transfer, "a sensible policy implies" that he is an "initial transferee." *Id.* at 895. *See also Harbour,* 845 F.2d at 1258 ("initial transferee" was "in a close relationship with both of the other two corners of [a] triangular transaction" and "[t]here was no evidence of any valid business reason for the debtor ... to have structured [the] transfers ... in the manner that he did").

Finally, the other case decided under section 550(a)(1) cited by Mr. Olson, *Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.)*, 33 B.R. 334 (Bankr.S.D.N.Y. 1983,) turned on the lack of direct dealings between the debtor and a law firm acting as an escrow agent for the ultimate transferee, as well as on the clearly established agency relationship between the law firm and the ultimate transferee. *Id.* at 337. In contrast, Mr. Olson dealt directly with Mr. Musurlian. Moreover, Mr. Olson did not receive the funds as an agent for any of the parties to the transaction. Rather, there was a strangely structured transaction whose exact rationale is unclear. More to the point than the holding of *Fabric Buys* is that case's dictum that the purpose of section 550 is "to preclude multiple transfers or convoluted business transactions from frustrating the recovery of avoidable transfers." *Id.* at 336.

While the result in this case may seem harsh, section 550(a)(1) must be applied as it is drafted and as the Seventh Circuit has construed it. Whatever equitable considerations weigh in favor of Mr. Olson are foreclosed by the command of the statute. As the court in *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Construction Co.)*, 86 B.R. 545 (N.D.Ill.1988), stated:

> Where Congress had crafted an unambiguous comprehensive statutory scheme, such as it has in the Code, we are extremely hesitant to tamper with that scheme by use of vague equitable powers. Section 550(a), read literally, authorizes recovery of voidable transfers from all initial transferees. Congress has made this decision and it is not the role of the court to subvert Congress' bankruptcy policy.

*Id.* at 552. *See also Bonded Financial*, 838 F.2d at 894 ("We have serious doubts ... about ... the propriety of judges' declining to enforce statutes that produce inequitable results. Bankruptcy statutes are not special cases.") (citation omitted).

Upon the foregoing which constitutes my findings of fact and conclusions of law in this proceeding, the trustee may have judgment against and recover from Mr. Olson the amount of the transfer made to him ($54,318.88) less the amount of his mortgage debt ($1,762.00). An order may be so entered.