**In re KAISER STEEL CORP., et al., Debtor.**

**KAISER STEEL RESOURCES, INC., Plaintiff,**

v.

**Irwin L. JACOBS, et al., Defendants.**

**Civ. A. No. 89–K–1731.**

United States District Court, D. Colorado.

Jan. 22, 1990.

H. Thomas Coghill, G. Stephen Long, Coghill & Goodspeed, Denver, Colo., and Susan M. Freeman, Lewis & Roca, Phoenix, Ariz., for Kaiser Steel Corp.

Rosalind C. Cohen, Katharine Gresham, Joseph H. Harrington, SEC, Washington, D.C., and Thomas D. Carter, Regional Trial Counsel, SEC, Denver, Colo., for party in interest SEC.

Kenneth L. Baker, Michael H. Berger, Waldbaum, Corn, Koff & Berger, Denver, Colo., for National Finances Service Corp.

Thomas H. Young, Michael J. Guyerson, Rothgerber, Appel, Powers & Johnson, Denver, Colo., for Charles Schwab & Co., Inc.

David I. Blejwas, Rosanne M. Thomas, Hahn & Hessen, New York City, for Bear Stearns and Co., Cowen & Co., Doft & Co., Inc., L.F. Rothschild & Co., Inc., Unterberg Towbin, Shearson Lehman Bros./American Express Inc., Smith, Barney, Harris, Upham & Co., Inc.

Richard S. Vermeire, Thomas H. Keyse, Dwight K. Shellman III, Moye, Giles, O'Keefe, Vermeire and Gorrell, Denver, Colo., for Bear Stearns & Co., Cowen & Co., Doft & Co. Inc., L.F. Rothschild & Co., Inc., Unterberg, Towbin, Shearson Lehman Bros./American Express, Inc., Smith, Barney, Harris, Upham & Co., Inc., Tweedy Brown Clearing Corp., Fahnestock & Co., Edward A. Vinert & Co., First Albany Corp., Tucker, Anthony & R.L. Day, Inc., Thomson McKinnon & Co., Inc., and Kellner, DiLeo & Co., Inc.

Robert A. Zupkus, Zupkus & Ayd, P.C., Denver, Colo., for AmSouth Bank, N.A.

David B. Rosenman, Lewis, D'Amato, Brisbois, Bisgaard, Los Angeles, Cal., for Bank of New England and Bank of New England–West.

William D. Nelson, Asst. Gen. Counsel, Denver, Colo., for Boettcher & Co., Inc.

John B. Moorhead, Theodore Shih, Baker & Hostetler, Denver, Colo., for Drexel Burnham Lambert, Inc.

J. Michael Morgan, Lohf Shaiman & Ross, P.C., Denver, Colo., Sara E. Moss, C. Willima Phillips, Howard, Darby & Levin, New York City, for Brown Brothers Harriman & Co.

James J. Moylan, James J. Moylan & Associates, Chicago, Ill., for Burke, Christensen, & Lewis Securities, Inc.

John S. Lutz, Salie B. O'Malley, Kelly, Stansfiled & O'Donnell, Denver, Colo., for Chicago Corp., Piper, Jaffray & Hopwood, Speak, Leeds & Kellogg and SLK–SEG, and Tweedy Brown Clearing Corp.

Barry L. Wilkie, Charles R. Beach, W. Bruce Thompson, Shaw, Spangler & Roth, Denver, Colo., P. Kevin Casterl, Susan Harkins, Cahill, Gordon & Reindel, New York City, for Dillon, Read & Co. Inc.

Karen Johnson–McKewan, Brobeck, Phleger & Harrison, San Francisco, Cal., for Wells Fargo and Crocker Nat. Bank.

Jeffrey A. Kehl, McGuire & Tierman, New York City, for Kellner, DiLEO & Co., Inc.

Michael H. Du Boff, Salon, Marrow & Dyckman, New York City, for Ernst & Co.

Michael Heitner, Herrick, Feinstein, New York City, for Evans & Co., Inc.

Paul L. Matecki, Boca Raton, Fla., for JW Charles Securities, Inc.

Robert Swanson, Hamilton, Myer, Swanson, Faatz & Clark, Denver, Colo., for Josephthal & Co. Inc. and Herzfeld & Stern, nka JII Securities, Inc.

Jay G. Epstein, Shearman & Sterling, New York City, for Lewco Securities Corp.

Edwin G. Perlmutter, M. Frances Cetrulo, Howard B. Gelt, Berenbaum & Weinshienk, P.C., Denver, Colo., for National Bank of Detroit, May Financial Corp., Manufacturers and Traders Trust Co. and Bankers Trust of New York.

Douglas R. Ferguson, Hopper, Kanouff, Smith, Peryam and Terry, Denver, Colo., for Olde Discount Corp.

**516**

William C. Roush, Freud, Markus, Slavin & Galgan, Troy, Mich., for Roney & Co.

Luke J. Danielson, Laurie K. Rottersman, Gersh & Danielson, Denver, Colo., for Stifel Nicolaus & Co.

Jacques A. Machol, Jr., Jacques A. Machol, III, Randall D. Johnson, Machol & Machol, P.C., Denver, Colo., for U.S. Trust Co. of New York.

Dennis C. Brown, Munger, Tolles & Olson, Los Angeles, Cal., Robert F. Hill, Karen A. Tomb, Hill & Robbins, Denver, Colo., for Pacific & Co.

Martin P. Unger, Gaston & Snow, New York City, James A. Shpall, Wolf & Slatkin, P.C., Denver, Colo., for Securities Settlement Corp.

Mark Grobmyer, Arnold, Grobmyer & Haley, Little Rock, Ark., Harold A. Feder, Feder, Morris, Tamblyn & Goldstein, Denver, Colo., for Stephens, Inc.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This is an appeal from the bankruptcy court's September 25, 1989, ruling denying the motion of Charles Schwab & Co., Inc. for summary judgment in the *Jacobs*[1] action. There were no disputed issues of fact. Schwab argued that it was entitled to summary judgment because it was a mere conduit in the stock redemption transactions which occurred as part of the 1984 leveraged buyout of Kaiser. Other parties joining in the motion argued that the payments Schwab received were "settlement payments" exempt from recovery under 11 U.S.C. § 546(e). The bankruptcy court denied the motion, finding that Schwab could be held liable under common-law agency principles and holding § 546(e) inapplicable. On October 25, 1989, I granted leave to appeal this interlocutory ruling. After examining the briefs and listening to oral argument, I reverse the bankruptcy court's ruling.

There are three issues raised by this appeal. First, can Schwab be required to turnover proceeds from an allegedly fraudulent conveyance as an "initial transferee" under 11 U.S.C. § 550(a)(1)? Second, even if Schwab can be considered initial transferee, is it nevertheless protected by 11 U.S.C. § 546(e), which exempts "settlement payments" made to brokers from recovery as a fraudulent conveyance? Third, in the absence of a clear interpretation of §§ 550(a)(1) and 546(e), do common-law agency principles require that Schwab be held liable for these transactions?[2] These issues are discussed below.

### I. *Facts.*

#### A. *The 1984 Leveraged Buy-Out.*

In 1984, the Kaiser Steel Corporation entered into a merger agreement with the Kaiser Acquisition Corporation (KAC), a Delaware corporation owned by Equivest Associates, a partnership. Under the merger agreement, the KAC acquired ownership of all of the outstanding common stock of Kaiser. In exchange, the stockholders of Kaiser received $22.00 per share of common stock, plus one share of Series A and one share of Series B preferred stock.

---

1. *Kaiser Steel Resources, Inc. v. Jacobs,* No. 87-E-137 (Bankr.D.Colo. Feb. 27, 1987).

2. A number of parties have filed briefs in this appeal. Schwab's brief addresses whether it can be held to be an initial transferee under § 550 and whether agency law applies to this determination. Bear Stearns & Co., Inc. (with other parties) has briefed the issue of the § 546(e) exception for settlement payments. The brief of Chemical Bank (with other parties) analyzes whether there was a contractual relationship between Kaiser and Schwab for the purposes of holding Schwab liable as an agent for an undisclosed or partially disclosed principal. The Stephens Group, Inc. has filed a short brief, adopting many of the arguments of the above parties. The SEC has likewise filed a brief in this appeal, outlining the mechanics of the stock settlement process, the functions of a clearinghouse and the ramifications of an affirmance of the bankruptcy court's order on the stock clearance and settlement system. The SEC is entitled to participate in this action under 11 U.S.C. § 1109(a), which permits the SEC to "raise and ... appear and be heard on any issue" in a chapter 11 case. Finally, Kaiser has filed a brief defending its position in this appeal.

Kaiser prepared a prospectus and proxy statement outlining the terms of the proposed merger. At a shareholders meeting on January 18, 1984, the Kaiser shareholders approved the merger. Upon the filing of the merger agreement with the Delaware Secretary of State on February 29, 1984, the merger became effective. Kaiser Steel Corporation merged with KAC and became a Delaware corporation.

### B. *The Redemption of Kaiser Stock.*

Kaiser contracted with the Bank of America to act as its disbursing agent to effect the redemption of Kaiser stock during the LBO/merger. Bank of America was authorized to receive the redeemed stock and to distribute the cash payments and newly issued preferred stock to shareholders. At the time of the redemption, Kaiser did not know who owned its common stock.

Some of the Kaiser's stock was owned by customers of Schwab. Schwab used the services of the Depository Trust Company (DTC) to effect the redemption of its customers' stock. DTC is a settlement and clearing agency for stock transactions registered under the Securities Exchange Act of 1934. DTC and other securities clearinghouses enable financial organizations such as Schwab to transfer and pledge securities on behalf of their customers by means of computerized bookkeeping records without physically transferring the securities. DTC also retains physical custody of stock certificates on behalf of its clients. Certificates for registered securities deposited with DTC are held in the name of Cede & Co., DTC's holding company.

As a participant in DTC, Schwab registers its customers' securities in a nominee name, or "street name," in this case in the name of Schwab & Co., Inc. Use of the nominee or street name registration permits DTC to record the transfer of stock between participants' customers by book entry, without the need to change the registration on the issuer's books in order to transfer the securities. Instead, the transferor's account with DTC is simply debited and the transferee's is credited.

For the redemption of its customers' Kaiser stock, Schwab instructed DTC to surrender the Kaiser shares held for Schwab's customers in the name of Cede & Co. to the Bank of America.[3] Upon receipt of the proper documentation, Bank of America distributed the cash and preferred stock to DTC. DTC then credited the funds to the National Securities Clearing Corporation (NSCC), Schwab's sponsor in DTC.[4] Schwab then credited its customers' accounts.

It is undisputed that, at the time of the merger, Schwab held no Kaiser stock for its own benefit. It is likewise undisputed that Schwab provides no investment advice to its customers, that it did not advise its customers on the merits of the LBO, and that it received no compensation for any services relating to the redemption. Schwab followed the instructions of its customers concerning the voting of their shares with respect to the approval of the LBO; some were voted for the transaction, and some against it. Schwab's form agreements with its customers provide that all securities and money held in Schwab accounts are subject to a lien for the discharge of customer indebtedness to Schwab. Some types of account agreements permit Schwab to pledge securities in Schwab's possession to secure amounts due from customers.

### C. *The Jacobs Action.*

Kaiser filed the *Jacobs* action in February of 1987. *Jacobs* is a fraudulent conveyance action under the "strong arm" clause of § 544(b) of the Bankruptcy Code. That section provides:

---

**3.** Schwab also tendered 3,623 shares directly to the Bank of America, principally because the DTC ceased handling transfers of Kaiser stock during the time between the shareholders approval of the merger and the actual redemption date.

**4.** NSCC is also a clearing agency registered with the SEC. Schwab is a participant in NSCC, and NSCC is a member of DTC.

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b). The strongarm clause grants Kaiser the rights of a hypothetical creditor. Kaiser must bring this action under § 544(b) rather than under the Bankruptcy Code's own fraudulent conveyance provision, 11 U.S.C. § 548, because § 548 applies only to fraudulent transfers made within one year of the filing of the bankruptcy petition. (The stock redemption in this case occurred outside of the one-year period).

In *Jacobs*, the "applicable law" under § 544(b) is California's fraudulent conveyance statute, Cal.Civ.Code § 3439.04, .05, .06 (1985), which parallels sections 4, 5 and 6 of the Uniform Fraudulent Conveyance Act. Under this statute, a conveyance can be set aside if (1) the transferor received less than fair consideration and was insolvent or rendered insolvent by the transfer, (2) the transferor was left with an unreasonably small amount of capital with which to operate, or (3) the transferor intended or believed it would incur debts beyond its ability to pay them as they matured. In *Jacobs*, Kaiser is seeking to recover the $22.00 per share payment made to the common stockholders under each of these theories.

Kaiser initially named 16 defendants in the *Jacobs* action, consisting of the Jacobs Group (a large shareholder group which had earlier attempted a hostile takeover), DTC, Cede & Co., other clearing agencies and some brokerage firms. After discovery of these defendants, Kaiser amended its complaint, adding approximately 178 additional parties who were primarily banks and brokerage houses.[5] Kaiser subsequently voluntarily dismissed DTC, Cede

& Co., the NSCC and other parties from the action.

On June 30, 1988, Schwab moved for summary judgment on the ground that, like DTC and the other clearinghouse defendants, it was a mere conduit in the LBO/merger transaction and therefore could not be held liable for the return of any payments related to the transaction. Other parties joined the motion as a "test case" on the conduit liability issue. Kaiser and Schwab filed a joint, stipulated statement of facts and affidavits, and Kaiser filed a supplemental statement of facts. On September 25, 1989, Judge Matheson denied the motion for summary judgment.

### D. *The Bankruptcy Court's Ruling.*

In its published decision, *see In re Kaiser Steel Corp.*, 105 B.R. 639 (Bankr.D. Colo.1989), the bankruptcy court undertook a comprehensive analysis of the issues raised by the Schwab motion. Although it recognized the many court decisions in which mere conduits in a transaction were exempted from an action by the trustee to recover a fraudulent conveyance, *see id.* at 644–648, it distinguished these cases by concluding that each rested on commonlaw agency principles. "This conclusion," the court stated, "while seemingly simplistic, obviates the need for the convoluted analyses which have resulted from both the 'innocent conduit' theory and the need to invoke the court's 'equitable powers under section 105(a) ... to prevent an inequitable result.' This is not new law, but is consistent with the concepts already propounded by the courts thus far, regardless of the label attached to them." *Id.* at 649.

Applying agency law, the bankruptcy court noted that Schwab's registration of its customers' securities in its street name was significant because Kaiser's records would indicate that Schwab was the shareholder of record. Therefore, "in Kaiser's eyes, it contracted with Schwab...." *Id.* The court went on to conclude that

---

**5.** In February, 1989, Kaiser filed its complaint in *Kaiser Steel Resources, Inc. v. Becker*, No. 89–E–154 (Bankr.D.Colo. Feb. 10, 1989). In *Becker*, Kaiser asserted essentially the same

claims as in *Jacobs* against the former beneficial owners of Kaiser stock who received compensation in the LBO.

Schwab's capacity was that of an agent for an undisclosed principal, and that under "hornbook law," Schwab was liable for any obligations arising out of the transaction. *Id.* Finally, the court rejected the Bear Defendant's argument that the payments to Schwab were "settlement payments" under § 546(e) of the Code, finding that the term applied only to "an isolated trade between a customer and dealer for cash in the ordinary course of the brokerage industry." *Id.* at 652.

## II. *Issues.*

A. *Schwab's Liability as an "Initial Transferee" Under Section 550 of the Code.*

Section 550(a) of the Bankruptcy Code governs the trustee's (or a debtor in possession's) recovery of a fraudulent conveyance. This section provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section *544*, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the *initial transferee* of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.[6]

11 U.S.C. § 550(a) (emphasis added). Thus, in order for Schwab to be liable under § 544 for this fraudulent conveyance, it must be an "initial transferee" under § 550(a) or an immediate or mediate transferee of the initial transferee. In its motion for summary judgment, Schwab claimed that it was not the initial transferee of the LBO consideration but was an innocent conduit in the transaction, as were the commercial clearinghouses who were voluntarily dismissed from the action.

The Bankruptcy Code does not define the term "transferee" or "initial transferee." Consequently, in a struggle to define the term "initial transferee" within its logical limits, courts have excepted from its scope a party who acts only as " 'a mere custodian, an intermediary or conduit between the bankrupt and the creditor' " and who has no beneficial interest in the thing to be recovered. *See Salomon v. Nedlloyd (In re Black & Geddes, Inc.),* 59 B.R. 873, 875 n. 4 (Bankr.S.D.N.Y.1986) (quoting Judge Cardozo in *Carson v. Federal Reserve Bank,* 254 N.Y. 218, 235–36, 172 N.E. 475 (1930)). The bankruptcy court's opinion below contains a thorough discussion of the development of this doctrine. *See* 105 B.R. at 644–48.

In a nutshell, bankruptcy courts, district courts, and courts of appeal have limited the trustee's recovery of funds from banks, law firms, and different industry clearinghouses when these organizations acted solely as intermediaries in the fraudulent transaction. *See, e.g., Lowry v. Security Pac. Business Credit, Inc. (In re Columbia Data Prods., Inc.),* 892 F.2d 26 (4th Cir.1989) (bank with no direct relationship to debtor not an initial transferee); *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196 (11th Cir. 1988) (bank which deposited payment from debtor into third party's account not an initial transferee); *Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890 (7th Cir.1988) (same); *Metsch v. First Ala. Bank. (In re Columbian Coffee Co.),* 75 B.R. 177 (S.D.Fla.1987) (same); *Jet Fla., Inc. v. Airlines Clearing House, Inc. (In re Jet Fla. Sys., Inc.),* 69 B.R. 83 (Bankr.S. D.Fla.1987) (airline clearinghouse not liable for payment from debtor which it applied to creditor airline's account); *Salomon v. Nedlloyd (In re Black & Geddes, Inc.),* 59 B.R. 873 (Bankr.S.D.N.Y.1986) (steamship

---

**6.** Section 550(b) limits the trustee's recovery from immediate and mediate transferees of the initial transferee. It provides:

> (b) The trustee may not recover under section (a)(2) of this section from—
>
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without

knowledge of the voidability of the transfer avoided; or

> (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(b). Section 550(c) further provides that the trustee is entitled to a single satisfaction under subsection (a).

company not initial transferee of payment by debtor freight forwarder on obligation to common carrier); *Ducker v. Fairmeadows II (In re Bridges Enter., Inc.)*, 62 B.R. 300 (Bankr.S.D.Ohio 1986) (law firm acting as conduit of settlement payment not an initial transferee); *Gopper v. UNITRAC, S.A. (In re Fabric Buys of Jericho, Inc.)*, 33 B.R. 334 (Bankr.S.D.N.Y.1983) (same).[7]

Courts have rested this doctrine on two theoretical bases. First, applying a statutory analysis, they have noted that the term "transferee" implies more than just a possessor, holder or agent. "[T]he minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded Fin. Servs.*, 838 F.2d at 893. Thus, in the several circuit court cases examining the issue, a "control test" has emerged. The test requires that the court examine the transaction as a whole to determine whether the recipient of the funds or property "actually controlled the funds or merely served as [a] conduit[ ]." *In re Chase & Sanborn Corp.*, 848 F.2d at 1200.

To a lesser extent, courts addressing the conduit liability issue have also premised the exception on their inherent equitable powers. As noted by the court in *In re Chase & Sanborn Corp.*, "[t]he control test, then, as adopted by this circuit, simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable. This approach is consistent with the equitable concepts underlying bankruptcy law." *Id.* at 1199; *see also* 4 *Collier on Bankruptcy* ¶ 550.02 at 550–8 (L. King 15th ed. 1989) ("In some circumstances, a literal application of section 550(a) would permit the trustee to recover from a party who is innocent of wrongdoing and deserves protection. In such circumstances

the bankruptcy court should use its equitable powers to prevent an inequitable result.") In contrast, the Seventh Circuit in *Bonded Financial* downplayed the role of equity in its reasoning on the conduit issue, stating,

We are aware that some courts say that an agent (or a bank in a case like ours) is an "initial transferee" but that the courts may excuse the transferee from repaying using equitable powers. This is misleading. "Transferee" is not a self-defining term; it must mean something different from "possessor" or "holder" or "agent". To treat "transferee" as "anyone who touches the money" and then to escape the absurd results that follow is to introduce useless steps; we slice these off with Occam's Razor and leave a more functional rule. ... We mention the problem not to resolve it (for it is not before us) but to show that this appeal to "equity"—to deny recovery against an "initial transferee" within the statute—is different in source and scope from the way in which we have employed considerations of policy to *define* "transferee" under § 550(a)(1). Doubts about this use of equity do not imply that courts should take "transferee" for all it could be worth rather than for what a sensible policy implies it is worth.

838 F.2d at 894–95 (citations omitted). Regardless of what theoretical basis justifies the limitation of the term "initial transferee" to persons who exercise some degree of control over the funds transferred, it is clear this limitation is judicially recognized.

■ Applying the control test to this case, the logical conclusion is that Schwab cannot be considered an initial transferee. Schwab's role in the stock redemption was almost identical to that of the securities clearinghouses and related entities who

---

7. In several cases, courts have recognized the "mere conduit" doctrine but have declined to apply it because of the bad faith of the transferee or its knowledge of the fraudulent nature of the transaction. *See, e.g., Huffman v. Commerce Sec. Corp. (In re Harbour)*, 845 F.2d 1254, 1257 (4th Cir.1988); *Kepler v. Olson (In re Mu-*

*surlian)*, 97 B.R. 985, 989 (Bankr.W.D.Wis.1989). There are no allegations in this case that Schwab acted in bad faith or had any culpable knowledge of the allegedly fraudulent conveyance; therefore, this gloss on the "mere conduit" doctrine would not apply.

were earlier dismissed from the action. As required by the terms of the merger agreement between Kaiser and KAC, Schwab either directed DTC to surrender its client's shares to the Bank of America for redemption or delivered the shares directly to Bank of America (see note 3). The Bank of America then disbursed the cash payment and preferred stock to DTC, who credited Schwab's NSCC-sponsored account. Schwab, in turn, credited its customers' accounts. Schwab never held a beneficial interest in any Kaiser stock, received no consideration for facilitating the conversion of its customers' stock, and had no ability to control the disposition of funds paid to its customers in the merger. It was simply a financial intermediary, not a "transferee."

Kaiser seeks to establish that Schwab exercised dominion over the funds paid to its customers by referencing certain provisions in Schwab's customer agreements which grant it a lien on assets held by Schwab and by arguing that Schwab had the discretion to vote its customers' stock for or against the merger. As noted by the SEC, however, Commission regulations set strict requirements on a broker's use of customer funds to protect against misuse and abuse. *See* 17 C.F.R. 240.15c3–3. Schwab's customer agreements provide that the broker's lien and repossession rights are only to secure amounts due Schwab. There is no evidence that Schwab could arbitrarily apply customer funds for its own benefit. Likewise, industry rules require Schwab to vote stock held in street or nominee name only as directed by the beneficial owner. *See* SEC Reply Brief at 2 (citing New York Stock Exchange Guide (CCH) ¶ 2452). Contrary to Kaiser's suggestion, Schwab may not vote customer stock according to its own desires.

Given that the undisputed facts in this case indicate that Schwab was nothing more than a mere conduit and that Kaiser's attempt to establish Schwab's control over the transferred funds flies in the face of established regulations controlling the broker's action with respect to customer accounts, the bankruptcy court should have concluded that Schwab is not an "initial transferee" under § 550. Nevertheless, the bankruptcy court distinguished the above cases, stating "[i]n no instance where a court finds a defendant to be a 'mere conduit' is there a direct creditor/debtor relationship or any other direct contractual relationship specifically related to the funds transferred between the debtor and defendant." 105 Bankr. at 648. It then went on to conclude that, under common law agency principles, Schwab could be held liable as agent for an undisclosed principle. This issue is discussed in Section IIC, below.

B. *Applicability of Section 546(e) Exception for Settlement Payments.*

▮ As an alternative to § 550, Schwab and other brokers argue that the payments in question are exempt from recovery as a fraudulent conveyance under 11 U.S.C. § 546(e). That section states:

> Notwithstanding sections *544*, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a ... settlement payment, as defined in section 741(8) of this title, made by or to a commodity broker, forward contract merchant, *stockbroker*, financial institution or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title.

11 U.S.C. § 546(e) (emphasis added). Section 741(8), in turn, cryptically defines a "settlement payment" as a "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). The bankruptcy court ruled that the term "settlement payment" is limited to payments connected with "an isolated trade between a customer and dealer for cash in the ordinary course of the brokerage industry." 105 B.R. at 652. It then held that the stock redemptions in this case were not ordinary securities transactions and were outside the § 546(e) exception.

Schwab, other brokers, and the SEC argue that the term "settlement payment" should not be so narrowly defined. Three

factors support this conclusion. First, the § 741(8) definition itself references "any similar payment commonly used in the securities trade," indicating that the term should be given a reasonably flexible meaning with reference to industry practice.[8] Second, as the appellants note, the only two cases addressing this issue, *In re Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n.*, 878 F.2d 742 (3d Cir.1989), and *In re Blanton*, 105 B.R. 811 (D.Va.1989), have interpreted the term broadly, albeit in circumstances not germane to this appeal. Finally, as stressed by the SEC, defining the term "settlement payment" to encompass the transfers in this case is consistent with the legislative intent behind § 546(e) to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions. *See, e.g., Seligson v. New York Produce Exch.*, 394 F.Supp. 125 (S.D.N.Y.1975) (trustee of bankrupt commodities broker sought to recover as a fraudulent conveyance margin payments to a clearinghouse, leading to Congress' enactment of § 546(e) and other provisions to protect commodities and securities brokers and related entities); *see also* 15 U.S.C. § 78q-1 (providing for the establishment and facilitation of a national system for the prompt and accurate clearance and settlement of securities transactions).[9]

## C. Bankruptcy Court's Reliance on Agency Principles to Hold Schwab Liable.

Despite the apparent applicability of conduit and settlement payment exceptions to the recovery of the funds in this case, the bankruptcy court chose to rely on agency principles to find Schwab potentially liable. Specifically, the court reasoned that, because Schwab held its customers' shares in street name,

> Kaiser's records would indicate that Schwab was the shareholder of record. Kaiser had no information as to who the true owner was or whether anyone other than Schwab owned the shares. In addition, the affidavits of Schwab indicate that Schwab *generally* held the shares in street name only for the benefit of the customers, the beneficial owners. Implicit in the use of the word "generally" is that there are some occasions when Schwab trades on its own account. In those instances Schwab is the principal, and not merely an agent for a beneficial owner. Regardless, in Kaiser's eyes, it contracted with Schwab, its records indicate Schwab is the record owner, Kaiser disbursed funds to Schwab on an unrestricted basis, and Kaiser sued Schwab as transferee of the funds.

105 B.R. at 649. The court then concluded that, as an agent for an undisclosed principal, Schwab could be held liable. *Id.*

There are several problems with this analysis. First, the bankruptcy court incorrectly assumed that Kaiser's records would indicate that Schwab was the record owner of Kaiser stock. As established in uncontroverted affidavits, however, Kaiser stock held by Schwab's customers in street

---

8. For example, in Group of Thirty, *Clearance and Settlement Systems in the World's Securities Markets* (1989) (a document published by a private sector group concerned with the international financial system and attached as Appendix A to Kaiser's brief), the functions of a central securities depository (such as DTC) are described. Among the customary responsibilities of such a depository is to facilitate "corporate actions" which "generally include public offerings, rights issues, entitlement issues, warrants, tender offers, *exchanges*, and bonus shares." *Id.* at 59 (emphasis added). The depository is responsible for transmitting details of corporate action to participant shareholders and then executing shareholder and corporate instructions to adjust the shareholder's position. *Id.* In the glossary to this publication, the term "settle-

ment" is broadly defined as "[t]he completion of a transaction, wherein securities and corresponding funds are delivered and credited to the appropriate accounts." *Id.* at 86. Assuming that a corporate merger and redemption of stock is a transaction, this definition would seem to cover the payments at issue in this case.

9. In this case, the DTC held a huge block of Kaiser securities in its nominee name, "Cede & Co." There is little question that were DTC required to refund the payments in this case, it would have a significant effect on the corporation. Since Schwab is in essentially the same position as the DTC (only one step further down the line of conduits), it should receive similar protection.

name was actually registered in the name of DTC's nominee, Cede & Co. Consequently, if anything, Kaiser's records would indicate that it was dealing with Cede & Co., not Schwab. Contrary to the bankruptcy court's assumption, it is likewise undisputed that Schwab did not and does not trade Kaiser or other stock for its own account except to correct short-term trading errors, if any.

More importantly, the bankruptcy court's application of agency principles assumes that there is a contract between Kaiser and Schwab, when in fact no contractual relationship was ever formed. The distribution in this case was the result of a corporate merger transaction, not a negotiated contract between Kaiser and Schwab or its customers. The power to merge is derived from a state's corporation law and controlled by the merger agreement. In this case, when the merger agreement was filed with the Secretary of State of Delaware, the merger became effective and the conversion provisions of the agreement were automatically activated. *See generally Shields v. Shields,* 498 A.2d 161, 167 (Del. Ch.1985) (corporate act of merger effects a "transmutation" of the stock interest). Consequently, the bankruptcy court's reliance on contract-based rules of agency law is misplaced.

III. *Conclusion.*

Although no court has considered whether a stockbroker is an initial transferee from whom a fraudulent conveyance can be recovered under § 550, in a number of other cases courts have found parties acting in similar capacities to be outside the scope of this section. Schwab should not be considered an initial transferee in this case because it exercised no control over the funds it conveyed to its customers and derived no benefit from the transaction. Kaiser's attempt to establish Schwab's dominion over the funds is specious in light of agency and industry regulations limiting Schwab's ability to take the actions alleged by Kaiser. Even if Schwab can be considered an initial transferee, the "settlement payment" exception of § 546(e) should be broadly construed to cover the

payments in this case. To hold Schwab and other similarly situated parties potentially liable under these circumstances could have serious consequences on the Congressionally-mandated system for the clearance and settlement of securities transactions. Finally, the bankruptcy court's reliance on agency law to circumvent the above Code sections is questionable at best and rests on a mistaken understanding of Schwab's relationship with Kaiser in this case.