**In re SOUTHERN INDUSTRIAL BANKING CORPORATION, d/b/a Daveco.**

**Thomas E. DuVOISIN, Liquidating Trustee,**

v.

**KENNERLY, MONTGOMERY, HOWARD & FINLEY, a General Partnership, et al.**

No. CIV–3–89–581.

United States District Court, E.D. Tennessee, N.D.

March 12, 1991.

Gary R. Patrick, Patrick, Beard & Richardson, Chattanooga, Tenn., Michael A. Davis, Carolyn Frost, Knoxville, Tenn., for plaintiffs.

Donna Temple, U.S. Atty., Knoxville, Tenn.

W. Kyle Carpenter, H. Bruce Guyton, R. Louis Crossley, Jr., M. Denise Moretz, Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, Tenn., M. Caldwell Butler, Roanoke, Va., for Kennerly, Montgomery & Finley, W.W. Kennerly, Robert Finley, L. Anderson Galyon, III, Darryl G. Lowe, Thomas C. Cravens, II, Alexander M. Taylor, Jack M. Tallent, II, G. Wendell Thomas, Jr., and Mary Montgomery.

## MEMORANDUM AND ORDER

HULL, Chief Judge.

On April 27, 1989, the Honorable Steven W. Rhodes, United States Bankruptcy Judge, sitting by designation in the United States Bankruptcy Court for the Eastern District of Tennessee, granted a judgment in favor of the plaintiff Thomas E. DuVoisin, Liquidating Trustee of Plan and Creditors' Liquidation Trust, Southern Industrial Banking Corporation [SIBC], finding that the law firm of Kennerly, Montgomery, Howard & Finley and its individual partners [KMH & F] were liable for an $8,049,486.20 preference under 11 U.S.C. §§ 547(b) and 550 and for a $5,814,000. fraudulent conveyance under §§ 548(a) and 550 of the Bankruptcy Code. 99 B.R. 827. That judgment was appealed to this Court by KMH & F. The plaintiff SIBC cross-appealed, challenging various prior rulings which had dismissed its claims against KMH & F predicated on securities fraud and denied its proposed third amended complaint asserting breach of fiduciary duty, conflict of interest, malpractice and negligence. This Order will treat the appeal from the Bankruptcy Court's ruling on the core proceedings; dispose of the non-core proceedings in this case; and address the threshold question of the bankruptcy court's jurisdiction over the adversary proceedings.

### I. *The question of jurisdiction.*

■ KMH & F has moved to vacate the judgment of the Bankruptcy Court and dismiss the adversary proceedings on the ground that the bankruptcy court lacks subject matter jurisdiction over the case. In the alternative, it would have this Court withdraw the reference to the Bankruptcy Court and try the proceedings *ab initio.* [Doc. 6]. In support of this motion, KMH & F contends that pursuant to the Supreme Court's opinion in *Granfinanciera, S.A., et al. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the bankruptcy judge, as a non-Article III judge, was without jurisdiction to consider SIBC's action to recover the proceeds of an alleged fraudulent conveyance and preference and that the jurisdictional provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984, particularly 28 U.S.C. § 157, are in violation of Article III of the Constitution of the United States.

In *Granfinanciera,* the Supreme Court was asked to determine whether a person who had not submitted a claim against a bankruptcy estate had a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent money transfer. The Court held that "the Seventh Amendment entitles such a person to a trial by jury, notwithstanding Congress' designation of fraudulent conveyance actions as 'core proceedings' in 28 U.S.C. § 157(b)(2)(H) (1982 ed. Supp. IV)." 109 S.Ct. at 2787. However, it specifically upheld its previous decision in *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), that when a creditor *has* submitted a claim against the estate, he has no right to a jury trial when sued for a preference as part of the process of allowance and disallowance of claims.

In its 1984 amendments to the Bankruptcy Code, Congress drew a new distinction between "core" and "non-core" proceedings. Core proceedings are traditional bankruptcy matters and include preference and fraudulent conveyance actions. Pursu-

ant to § 157(b)(2), bankruptcy judges may adjudicate and enter final orders in core proceedings subject to review of the district court. Non-core cases, which are merely related to bankruptcy proceedings, may also be heard by bankruptcy judges, but the judges may only recommend their disposition to the district court which enters final judgment after a *de novo* review of any matters to which an objection has been made. KMH & F argues that because the Supreme Court has now held, in *Granfinanciera*, that in making the core/non-core classification, Congress cannot deprive a litigant of his Seventh Amendment right to a jury trial, it has also held, by implication, that the designation under § 157 is unconstitutional and that preference and fraudulent conveyance actions must be tried by Article III judges.

The *Granfinanciera* decision requires no such conclusion. First of all, the Supreme Court most decidedly did not find § 157 unconstitutional. Its decision does not alter the core/non-core distinction; it would only permit a jury trial for those persons who *have not* submitted claims against the estate and who *have* made a demand for a jury. Moreover, the Supreme Court did not suggest that Congress violated the right to trial by an Article III judge. It even left open the possibility that the bankruptcy judge himself might hold the jury trials in these instances. *See*, 109 S.Ct. at 2794 and 2802.

In the case now before this Court, KMH & F *did* make a claim against the bankruptcy estate for legal services it had rendered the bankrupt. More importantly, it *did not* make a demand for a jury trial. Pursuant to Bankruptcy Rule 9015 (in effect at that time), this failure to make a timely demand constitutes a waiver of a trial by jury. There is no question, therefore, that the Bankruptcy Court had jurisdiction to try this case. Nothing in *Granfinanciera* is to the contrary.

For this reason, the Court will review the findings of fact (few of which are in dispute) on a "clearly erroneous" basis.

Accordingly, KMH & F's motion to vacate the judgment and dismiss the appeal [Doc. 6] will be denied.

## II. *KMH & F's appeal.*
### Background

As found by the Bankruptcy Court, SIBC was organized in 1929, as an industrial loan and thrift. It raised money by selling investment certificates to the public. It then loaned money at a higher interest rate, historically to consumers but, in recent years, as a result of changes in Tennessee's usury laws, also to commercial clients. C.H. Butcher, Jr., who was chairman of the board of SIBC and a major stockholder at all times pertinent to this action, and David Crabtree, another substantial stockholder, effectively controlled SIBC from 1972 until its bankruptcy on March 10, 1983.

In the fall of 1982, Butcher, who owned numerous banks in East Tennessee besides the SIBC, attempted to acquire two savings and loan associations in Florida. He signed an agreement to acquire the stock of Home Federal Savings & Loan of Palm Beach, Florida and Chase Federal of Miami, for a total purchase price of $50 Million Dollars, consisting of $25 Million in cash, and the balance in a letter of credit and a building called the United American Bank Plaza Building in Knoxville, Tennessee.

In order to demonstrate his ability to fund these acquisitions, Butcher decided to deposit $25 Million Dollars in escrow. Butcher and KMH & F and a third entity, Butcher–Tennessee Investment Corporation [BTIC], a corporation Butcher formed as a holding company to acquire and hold the stock of the two Florida savings and loans, entered into a specific, written escrow agreement which provided that Butcher and BTIC would deposit, and KMH & F would hold, $25 Million Dollars for the purpose of funding the stock acquisition of the two Florida savings and loans. The escrow agreement gave Butcher and BTIC the right to direct the investment of the escrowed funds, the right to have the funds returned should the purchase of the

Florida institutions fail, and the right to remove KMH & F as escrow agent.

■ Part of the escrow was to be funded by $10.4 Million Dollars from the SIBC. On January 5, 1983, at a time when the SIBC was insolvent, it issued three checks to Butcher for $5,910,000., $500,000., and $4,004,000. for a total of $10,414,000. Butcher authorized David Crabtree to sign his endorsement of these checks to the KMH & F escrow account. Initially, the checks were deposited to the KMH & F client trust account and commingled with other client funds. Later, the amount of these checks was withdrawn and deposited in a special escrow account that KMH & F established exclusively for this fund. In consideration for this transfer, SIBC acquired notes from Butcher which came from three sources—the C & C Plaza Limited Partnerships, the Investors Associates and Equity Investors Limited Partnerships, and the Syndicate Cable Investment Trust. The Bankruptcy Court heard lengthy and detailed proof about each of these groups of notes and concluded that they were worthless. Neither party disputes this finding on appeal and it seems to be well supported by the evidence. Because the SIBC was insolvent at the time it transferred the $10,414,000. in exchange for these notes, the Bankruptcy Court ruled this a fraudulent transfer and voidable within the meaning of § 548(a) of the Bankruptcy Code. This finding has not been disputed on appeal and will also be affirmed. The judgment entered against KMH & F for this fraudulent transfer was reduced by $4.6 Million Dollars (to $5,814,000.) because SIBC immediately sold participations in the C & C Plaza notes to other Butcher banks, reducing the amount SIBC actually lost. The Bankruptcy Court's netting of the transactions to give KMH & F credit for the sale of the participations is not contested on appeal and was certainly correct in terms of determining the amount of damage SIBC suffered as a result of the transfer in question.

■ In an attempt to put the money back where he got it, Butcher instructed KMH & F to purchase an $8 Million Dollar investment certificate from SIBC, using some of the escrowed funds, on January 6, 1983, the day after the fraudulent transfer mentioned above. KMH & F complied with this instruction and an $8 Million Dollar certificate was issued to "Kennerly, Montgomery, Howard & Finley Escrow Account." On January 31, 1983, after the plan to purchase the Florida savings and loans had fallen through, the investment certificate was redeemed. The Bankruptcy Court ruled that this redemption of the investment certificate was a transfer of property for the benefit of a creditor, on account of an antecedent debt (the investment certificate itself), made within 90 days of SIBC's bankruptcy, and allowing the creditor to receive more than it would have received if SIBC had been in a Chapter 7 bankruptcy. For this reason, he concluded that the redemption of the investment certificate was a voidable preference within the meaning of § 547(b) of the Bankruptcy Code. This finding is also undisputed on appeal and will be affirmed.

What is hotly disputed on appeal is whether or not KMH & F should be held liable for this preference and for the fraudulent transfer and, if they should, whether the Bankruptcy Court correctly determined the amount of this liability.

### Should KMH & F be treated as a Transferee?

■ Once a bankruptcy trustee has been able to avoid a transfer by a debtor on the grounds that it was fraudulent under § 548(a) or preferential under § 547(b), he turns to § 550 for the power to recover this money or property. Section 550 reads, in pertinent part,

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 547, [or] 548 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

The Bankruptcy Court found KMH & F to be an "initial transferee" under § 550(a)(1) as to both the fraudulent transfer and the preference and also a "creditor" for whose benefit a transfer was made for purposes of the preference. In the opinion of this Court, this mixed finding of fact and conclusion of law was correct with regard to the preferential transfer but clearly erroneous with regard to the fraudulent transfer, although KMH & F appears to have been an "immediate transferee" within the meaning of § 550(a)(2) with regard to the fraudulent transfer.

The term "transferee" is not defined in the Bankruptcy Code and there is no legislative history to suggest what the limits of this concept might be. It has been left to the courts to establish a reasonable definition of this term.

KMH & F relies heavily on the case of *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988), for the argument that, at a minimum, a transferee must be someone who has dominion over the money or other asset and the "right to put the money to ... [its] own purpose." 838 F.2d at 893. In the *Bonded Financial Services* case, the Seventh Circuit refused to accord transferee status to a bank which received a check from the debtor payable to the bank's order, with instructions to deposit the check in the depositor's account, because the bank received no benefit from this transfer and acted merely as a financial intermediary which held the check only for the purpose of fulfilling an instruction to make the funds available to someone else. If the reasoning of that case were applied to the facts of this one, KMH & F would not be accorded transferee status for either the fraudulent transfer or the preference be-cause it never had the right to put the escrowed funds to its own use and merely held the funds for the purpose of fulfilling instructions given by Butcher and/or BTIC.

The Bankruptcy Court did not follow the Seventh Circuit reasoning but took an approach followed in several other circuits. These courts take the approach that if the entity being sued to recover the preference or fraudulent transfer is technically the "initial transferee" (for example because it was the payee of the checks at issue), but it never obtained control over the funds and acted merely as a financial intermediary, then, rather than simply declaring it not a transferee at all (as the court did in *Bonded Financial Services*), the courts have looked to the equitable factors, such as good faith, in deciding whether or not to hold it liable. In *Nordberg v. Societe Generale (In re Chase & Sanborn Corporation)*, 848 F.2d 1196 (11th Cir.1988), a bank which received funds by wire transfer from a Chapter 11 debtor's account in another bank, and used these funds to partially cover the transferee bank customer's existing overdraft, was not held liable, although technically an "initial transferee" because it was a commercial conduit and lacked control over the funds. In *Gropper v. Unitrac (In re Fabric Buys of Jericho, Inc.)*, 33 B.R. 334 (Bankr.S.D.N.Y.1983), a law firm and "initial transferee" which held money in its escrow account as a "mere conduit" of funds intended for settlement of a lawsuit was not held liable for a preference when the suit settled and the money was paid out. As a rule, courts taking this approach were finding that the escrow agents or banks were *technically* transferees if the checks at issue were written to them, but that, because of their good faith and lack of knowledge of the debtor's insolvency, it would be inequitable to hold them liable.

There are no cases which indicate that the Sixth Circuit would adopt the minority approach followed by the Seventh Circuit in *Bonded Financial Services.* Therefore, the Bankruptcy Court's decision to treat KMH & F as a transferee, even though it

was merely a conduit for the funds, will not be disturbed.

As indicated earlier, because the three checks which made up the fraudulent transfer were not written to KMH & F but to Butcher, Butcher himself should have been held the "initial transferee" for purposes of the fraudulent transfer. And, under the terms of the escrow agreement, he and BTIC were the entities for whose benefit the transfers were made. However, because the checks were deposited into the KMH & F escrow account, KMH & F could properly have been held the immediate or mediate transferee under § 550(a)(2).

The situation is somewhat different with regard to the preference. KMH & F, acting at the instruction of Butcher, actually purchased the $8 Million Dollar SIBC investment certificate which was issued to "Kennerly, Montgomery, Howard & Finley Escrow Account." And, technically, KMH & F *was* the creditor of SIBC on the investment certificate. When KMH & F redeemed the certificate, it was the "initial transferee" within the meaning of 11 U.S.C. § 550(a)(1), at least with regard to the check SIBC issued directly to KMH & F in the amount of $2,545,101.60. The Bankruptcy Court found that it was also the "entity for whose benefit the transfer was made" because its investment certificate account was credited. Certainly with regard to the check issued in redemption of the investment certificate, this Court is satisfied that KMH & F was indeed a transferee and, because it never actually had control over the funds, or could use them for its own purposes, the Bankruptcy Court acted correctly in turning to the question of good faith before imposing liability. *See,* for example, *Huffman v. Commerce Security Corp. (In re Harbour),* 845 F.2d 1254 (4th Cir.1988) where an initial transferee, who was simply an intermediary with no actual control over the funds, *was* held liable for a fraudulent transfer under suspicious circumstances. And, while KMH & F cannot be considered an initial transferee with regard to the roughly $5.5 Million Dollars in notes which completed the redemption of the investment certificate, because the notes were delivered directly from SIBC to Butcher, the Bankruptcy Court found KMH & F to be the "entity for whose benefit the transfer was made" because their account was credited in this amount. These findings, with regard to the preference, appear to be correct.

Accordingly, the Bankruptcy Court's finding that KMH & F was a "transferee" (although not the initial transferee) with regard to the fraudulent transfer and a transferee with regard to the preference will be affirmed.

### KMH & F's liability for the fraudulent transfer and the preference

KMH & F's good faith defense depended largely on the credibility of the testimony of Lewis Howard, the partner in the firm who had the most dealings with Butcher and with SIBC. Mr. Howard claimed that he was unaware that fraudulent transfers from SIBC had funded any part of the escrow account and was unaware that SIBC was in any financial difficulty when the investment certificate was redeemed. The Bankruptcy Court did not credit this testimony and this decision is well supported by the evidence in the record. A careful reading of all the testimony at trial makes it clear that Mr. Howard was fully aware of SIBC's financial difficulties and that some of the money to fund the escrow would have to come from that source. Because he knew or should have known that the transfers were voidable, it was proper to hold KMH & F liable as a transferee for both the fraudulent transfer and the preference. This finding is based simply on KMH & F's knowledge that funds were being taken out of SIBC when it was insolvent.

The Bankruptcy Court made considerable, detailed findings on the good faith issue. Many of these go beyond what was necessary for a finding of liability under § 550, although they do relate to the claims of malpractice and breach of fiduciary duty which were not then before the court. These findings are not clearly erroneous and will not be set aside, but they should be separated, conceptually, from the judgment under § 550.

### The amount of KMH & F's liability for the preference

As indicated earlier, the Bankruptcy Court properly reduced KMH & F's liability for the $10.4 Million Dollar fraudulent transfer to allow for the fact that SIBC managed to sell $4.6 Million Dollars in participations in the C & C Plaza notes to other Butcher banks. The Bankruptcy Court found KMH & F liable for $5,814,-000.—or the actual damage SIBC suffered as a result of this transaction.

However, inexplicably, the Bankruptcy Court did not consider the actual damage SIBC suffered as a result of the preference. It properly held KMH & F liable for the amount of the check SIBC issued in redemption of the investment certificate, which was $2,545,101.60, but also held it liable for the balance of the redemption, plus interest, or $5,504,384.60, simply because KMH & F's account was credited in that amount. KMH & F argues that the Trustee had the burden of proving that the approximately $5.5 Million Dollars in redemption notes were, in fact, worth their face values. The Trustee replies that it did offer adequate proof on the value of these notes—at least enough to support the Bankruptcy Court's decision to accord them full value in its judgment against KMH & F. This Court disagrees.

Pursuant to § 550(a), a trustee may recover for the benefit of the estate, the property transferred or the value of such property. It is undisputed that, in this case, the plaintiff trustee sought to recover the value of the redemption notes, not the notes themselves, and that he had the burden of proving their value. The trustee attempted to prove their value through testimony by Butcher, who had signed many of the notes himself. Mr. Butcher was asked, "And did these notes have value to you? I mean, could you satisfy obligations, etc. with those notes?" and he answered, "Yes, sir." [Tr. 159]. When Mr. Crabtree was questioned about how the investment certificate was redeemed, he responded that "It was exchanged for a like amount of —$5.5 Million Dollars of Southern Industrial notes receivable." [Tr.

324]. The only other proof came from Mrs. Smithson, head bookkeeper for SIBC from 1980 through 1983, who testified that SIBC's records indicate that, in the redemption transaction, SIBC's commercial notes were reduced by $5,504,384.60 and that the investment certificate was reduced to zero. [Tr. 656, 657].

None of the notes, or copies of them, were introduced into evidence and not all of them have even been identified. On page 36 and 37 of KMH & F's brief on appeal, they describe eight of these notes with a total face value of between $4.4 and $4.5 Million Dollars. None of these are secured with any collateral. While, in some cases, it may be appropriate to simply rely on the bank's records as an indication of value of the property transferred, in this case it is not. For one thing, the record contains extensive evidence from Mr. Ronnie Parham, a Field Office Supervisor for the Federal Deposit Insurance Corporation who was the examiner-in-charge of investigating SIBC, concerning SIBC's insolvency. Mr. Parham testified credibly that approximately 79 percent of SIBC's total loans and 96 percent of its commercial loans were subject to classifications [Tr. 708] and that, as of April 4, 1983, SIBC had a negative net worth of $22.6 Million Dollars. [Tr. 684]. Considering the uncontroverted evidence that 96 percent of SIBC's commercial loans were worth less than their face value, it was improper for the Bankruptcy Court to accept that the $5.5 Million in notes given in redemption of the investment certificate were worth the amount shown on SIBC's books. Each notes should have been the subject of the same careful examination given to the notes Butcher gave in exchange for the $10,414.00 he borrowed from SIBC to fund the escrow account. The value of the redemption notes which were part of the preferential transfer has not been established and KMH & F should not be held liable for them. Accordingly, that part of the Bankruptcy Court's ruling will be reversed and KMH & F's liability for the preference will be reduced to $2,545,101.60.

■ KMH & F argues, in addition, that even a judgment of $5,814,000. for the fraudulent transfer and $2,545,101.60 for the preference results in an inequitable windfall to the Trustee because a judgment in this amount would exceed the actual harm SIBC suffered as a result of these transactions when they are viewed together. While it would agree that SIBC was harmed in the amount of $5,814,000. by the fraudulent transfer which went into KMH & F's escrow account, it contends that SIBC's position was actually improved to a better state than before that transfer when, on the following day, the escrow account purchased the $8 Million Dollar investment certificate. As of that date, SIBC had a net gain of $2,186,000. And when the investment certificate was redeemed, only $2,545,101.60 in actual cash was paid out, giving SIBC a net loss of only $359,101.60, plus any value the redemption notes might have had. KMH & F argues that if the purpose of the recovery sections of the Bankruptcy Code is to preserve the assets of the estate, then there is no reason for the Trustee to recover more from them than SIBC actually lost as a result of their maneuvers. This Court agrees with this approach. In the same way that the Bankruptcy Court reduced KMH & F's liability for the $10.4 Million Dollar fraudulent transfer to take into account the fact that SIBC was able to sell $4.6 Million in participations in the notes it received, it should have looked beyond the specifics of each transaction to determine how they diminished the assets of SIBC. There is no reason why the judgment in favor of SIBC pursuant to § 550 of the Bankruptcy Code, should exceed the actual harm suffered by it. Accordingly, the judgment on the core proceedings will be reduced to $359,101.60.

### III. *The Trustee's appeal.*

The Trustee contends that he was improperly denied recovery on several of his theories of liability. The Trustee filed this action to recover the preference and fraudulent conveyance on March 8, 1985. On December 9, 1985, he moved to amend his complaint to add allegations of conflicts of interest, breach of fiduciary duty, malpractice, breach of trust, and negligence with regard to KMH & F's dealings on behalf of SIBC. The amendment was allowed by order of March 7, 1986. After a lengthy struggle to obtain adequate discovery, the Trustee determined that he had grounds to assert an additional claim for recovery based on securities fraud. By Order of October 26, 1987, he was granted leave to file his second amended complaint making these further allegations. With the appearance of the securities claims, the case was removed to district court. In and Order of August 1, 1988, this Court dismissed the securities claims on the ground that SIBC could not show that it detrimentally relied upon its own misleading publications concerning its financial condition.

With the dismissal of the securities claims, the action was remanded to Bankruptcy Court for trial of the remaining claims, including, presumably, the claims of negligence, malpractice, etc. In September of 1987, the Trustee attempted to file a third amended complaint to recast his securities claims in terms of malpractice on the part of KMH & F—in other words to charge that, in assisting SIBC in its efforts to mislead the public about its financial position, the firm was guilty of legal malpractice. The Bankruptcy Court denied the Trustee leave to file this third amendment to the complaint.

One week before the trial of the case, while the parties were trying to work out an agreed pretrial order, KMH & F raised the affirmative defense of the statute of limitations with regard to the malpractice-related theories of recovery. On April 5, 1989, the Bankruptcy Court ruled, without explanation, that it would not consider the Trustee's claims for damages based on negligence, breach of fiduciary duty or conflict of interest although it would allow proof on these issues as they related to KMH & F's good faith defense against liability for the preference and the fraudulent conveyance.

On appeal to this Court, the Trustee contends that this Court erred in dismissing his securities fraud claims and that the Bankruptcy Court erred in dismissing his

third amended complaint and in denying any recovery for KMH & F's malpractice and related torts.

The Trustee's claims of securities fraud

■ As indicated earlier, in an Order of August 1, 1988, this Court dismissed the Trustee's second amended complaint alleging state and federal securities law violations, aiding and abetting securities fraud, and common law fraud. The allegations in that complaint fell into two distinct groups. One group, pleaded under the heading, "The Ridge Scheme," concerned SIBC's attempts to produce a fictitious financial gain on its books and financial statements through bogus sales and lease-back transactions and its subsequent sale of SIBC investment certificates based on these false or misleading financial statements. This Court conceded that the pleadings alleged securities violations aided and abetted by KMH & F, but ruled that it was the investors who purchased the certificates, not SIBC, through its Trustee, who had standing to pursue this claim. After all, it was SIBC which published the misleading information and only its investors who conceivably could have been the victims of this fraud.

The Trustee argues, on appeal, that there is case law suggesting that, as Liquidating Trustee, he does have standing to bring the securities claims. For example, in *Superintendent of Insurance of New York v. Banker's Life & Casualty Company*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), the liquidator of a private corporation alleged 10(b)(5) violations by the corporation's sole shareholder injuring the corporation (Manhattan) itself as well as the creditors. He was found to have standing to bring the securities fraud claim on behalf of Manhattan. However, in that case, the corporate officer and sole shareholder perpetrating the fraud deceived Manhattan's board of directors into authorizing the sale of all of its stock to a purchaser who, by devious means, paid for this stock, not with its own funds but with Manhattan's assets, depleting the corporation of $5,000,000. In other words, Manhattan was the victim, not the perpetrator, of the

fraud. There is no indication in the instant case that SIBC's directors were mislead by the actions of Butcher or any other corporate officer of shareholder. Moreover, there is no evidence that SIBC was harmed by the sale of its securities. On the contrary, there is evidence that SIBC raised $72,500,000. in additional capital as a result of its misleading financial statements. The Court will stand by its original decision with regard to any claim predicated on the "Ridge Scheme."

■ The second group of allegations, entitled the "Escrow Scheme," concerned the transactions already discussed in this opinion regarding Butcher's funding of the escrow account as a source of funds with which to purchase the two Florida savings and loan associations. In order to fund this account, various Butcher-related corporations executed notes which were sold to SIBC and other financial institutions. The second amended complaint alleges that, in the offer and sale of these investment notes, Butcher misrepresented and omitted material facts in order to deceive potential purchasers. As indicated above, SIBC purchased twenty of these notes for $10.4 Million Dollars. In its earlier ruling, this Court assumed, without actually so finding, that these notes *were* securities within the meaning of federal securities law. It simply dismissed this part of the Trustee's claim because there was no indication of "detrimental reliance" or any reason to believe that if Butcher had fully disclosed to SIBC that it was purchasing notes of little value, the investment decision would have been any different.

The Trustee urges, on appeal, that this Court make a specific finding that the notes purchased by SIBC as part of the "escrow scheme" were, in fact, securities. It recommends to this Court the test adopted by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). A preliminary review of that test suggests that the notes in question are, indeed, securities.

On reconsideration of the previous ruling with regard to the "escrow scheme" it does appear that SIBC was the victim of securi-

ties fraud, aided and abetted by KMH & F, and that, therefore, the Trustee does have standing to pursue this part of his claim. However, the damages suffered by SIBC as a result of the "escrow scheme" are the same as those already awarded the Trustee for the fraudulent conveyance. Accordingly, no additional damages are available to the Trustee on the second amended complaint and the previous ruling, dismissing it, need not be disturbed.

### The Trustee's malpractice-related claims

The Bankruptcy Court did not rule on SIBC's claims of malpractice, breach of fiduciary duty, conflict of interest, etc., and did not allowed SIBC to file its third amended complaint. While this case was on appeal from the core proceedings, this Court withdrew the reference on the tort action, allowed the third amended complaint to be filed, and considered these claim for the first time. The defendants have moved to dismiss the third amended complaint and for summary judgment on all malpractice-related theories of recovery. [Doc. 48].

In support of their motion, the defendants make two arguments: that the claims are time-barred and that no additional damages are available because the plaintiff has already had full recovery for its injuries in the core proceedings based on other theories of liability.

The malpractice related claims focus on three different factual situations. One has to do with KMH & F's role in making false representations of SIBC's financial situation to the State of Tennessee Department of Insurance; another involves the "Ridge Scheme" to sell and then lease back various corporate assets in order to make a fictitious gain on SIBC's books for the year 1981; and the third relates to the escrow transactions of January 1983. In the Court's opinion, any losses suffered by SIBC as a result of the escrow transaction have been fully redressed by the Bankruptcy Court in the core proceedings and can give rise to no further liability. Whether or not SIBC suffered additional damages as a result of any malpractice on the defendants' part with regard to the Ridge

Scheme and its dealings with the state, is unclear. Arguably the Ridge Scheme produced a quantifiable loss although the Trustee, ignoring this Court's express instructions regarding the filing of a third amended complaint, does not specify what the damages were. However, both the Ridge Scheme and the negotiations with the state were done in order to create the illusion that SIBC was solvent. They allowed SIBC to remain in business long after the state should have shut it down. But the fact that SIBC was able to continue to sell investment certificates and thereby bring in additional capital would not, of itself, produce any loss. If SIBC, through its continued operation, managed to drive itself deeper in debt, this would not necessarily be the proximate result of any malpractice on the defendants' part. The defendants' argument to dismiss on the ground that there are no additional damages to be redressed appears to be well taken.

■ The defendants also contend that the malpractice claims are time-barred. The statute of limitations governing actions for legal malpractice in Tennessee is found at Tenn.Code Ann. § 28–3–104(a). It is a one year limitations period running from the time when the cause of action accrues, or from when the plaintiff discovers, or, in the reasonable exercise of due diligence, should have discovered the defendant's malpractice. Section 108 of the Bankruptcy Code can extend that statute of limitations for the bankruptcy trustee by two years if the debtor files for bankruptcy before the original one-year period has expired. In this case, SIBC filed for bankruptcy on March 10, 1983, allowing the Trustee until March 10, 1985, in which to bring any malpractice claims that were not already time-barred. Neither the Ridge Scheme nor the false disclosures to the State of Tennessee were mentioned in any pleading until the second amended complaint was filed by the Trustee on October 28, 1987. Therefore, it would appear that both of these claims are time-barred unless there is some equitable reason why

the statute of limitations should not be applied in this case.

In opposing the defendants' motion to dismiss, or for summary judgment, the Trustee claims, by affidavit, that he did not learn of the Ridge Scheme for phony recapitalization or of KMH & F's involvement in the false representations to the State of Tennessee until October 28, 1986, when the defendants were finally forced by Court order to comply with his discovery requests. He claims that he had a year from *that date*, or until October of 1987, in which to bring the malpractice-related claims. His argument appears to be that the statute of limitations should be tolled until he, by reasonable diligence, should have discovered the cause of action even if this fell outside the statutory two-year period following the filing in bankruptcy. He does not believe that the cause of action should have accrued when SIBC *itself*, rather than the Trustee, knew or should have know of the torts. In fact, he would have the Court deem the entire period from 1979, when Mr. Howard wrote his first misleading letter to the state's Department of Insurance, until the filing of bankruptcy in March of 1983, a period of incapacity when SIBC was legally incompetent to bring a cause of action on its own behalf.

This legal incompetence theory is based on the fact that certain controlling officers of SIBC, notably Mr. Butcher and Mr. Crabtree, while fully aware of the Ridge Scheme and the efforts to mislead the state, were acting in concert with KMH & F to perpetrate a fraud on the corporation and cannot be expected to have advised SIBC's board of KMH & F's conflicts of interest, etc. Without this knowledge, the Trustee contends, the SIBC's directors could not be expected to have brought suit against KMH & F for malpractice.

The Court has reviewed the minutes of SIBC's board meetings in the hope of discerning exactly what the board knew or should have known. Oddly enough, there is nothing at all in these minutes to indicated that the board knew SIBC was selling off corporate assets and then leasing them back. It is possible, therefore, that the Ridge Scheme was accomplished without the knowledge of the board of directors. However, there is evidence in the minutes that at least by Spring of 1983, the board knew of the problems with John Neff, Commissioner of the Department of Insurance, and also knew defendant Lewis Howard was the attorney handling the matter. Mr. Howard attended several board meetings in early 1983, when things were beginning to fall apart. Obviously, SIBC was put on notice of Mr. Howard's dealings with the state by early 1983. However, the Trustee makes the extraordinary argument that "No other legal counsel was available to SIBC that could have recognized the malpractice, brought the malpractice to the attention of SIBC, and represented SIBC's interests in an action against the attorney wrongdoers." This is simply not true. A review of the corporation's minutes reveals that attorney Creed Daniel was at every single board meeting and that, in the Spring of 1983, both Mr. Daniel and defendant Lewis Howard of KMH & F were at the emergency board meeting where the problems with Commissioner Neff were discussed. The Court is not convinced that SIBC was legally incompetent to recognize malpractice in the period before its bankruptcy—at least with regard to the dealings with the State of Tennessee.

Assuming for the sake of argument, that SIBC *was* incompetent, and that, therefore, none of the malpractice related claims were time-barred before the filing of bankruptcy in March of 1983, the Court must then determine whether the Trustee had a fixed two-year period after the filing in which to bring these claims or whether the "discovery rule" could extend this period so that the statute of limitations would not begin to run until the Trustee knew or should have known about these claims. And, finally, if the Trustee is to be given the benefit of the discovery rule, the Court must determine whether the Trustee knew or should have known of these claims at any time before October of 1986,—one year prior to the filing of the second amended complaint.

The Court is of the opinion that the Trustee had a fixed two-year period after the filing in bankruptcy in which to bring these malpractice-related claims and that, because he failed to allege them in that period, they are necessarily time-barred. However, for the sake of argument, the Court will consider the facts as if the Trustee were to be given the benefit of the discovery rule.

Since the corporations's minutes reveal that SIBC was having trouble with the Commissioner of Insurance in early 1983, and that Mr. Howard of KMH & F was handing negotiations with the state on behalf of SIBC, the Trustee should have been on notice to inquire into this matter as soon as he was appointed. And while KMH & F may not have turned over its own copies of Mr. Howard's correspondence with the state, or the letters he drafted for SIBC's President Steiner to sign, until October of 1986, copies of these letters must have been in SIBC's *own* files and must also have been available from the state itself. The Trustee should have been able to bring any claim he had with regard to KMH & F's dealings with the state within the two-year window after bankruptcy was filed.

With regard to the Ridge Scheme for the sale and leaseback of corporate assets, the record indicates that the Trustee had a memorandum dated June 13, 1984, prepared by Mark Miller after an insolvency examination, which explains how these transactions defrauded SIBC although it does not mention KMH & F's role in these maneuvers. At that point in time, the Trustee was on notice that an injury had occurred, and was required to exercise due diligence in discovering its cause. The fact that KMH & F had prepared some of the deeds in question was already in evidence and the fact that the firm represented both sides of these transactions should not have been hard to discover. The record indicates that at least by December of 1985, David Crabtree was very candidly revealing KMH & F's behind-the-scenes role in various dealings. And while it may be true that the Trustee did not see the document outlining the Ridge Scheme until October of 1986, the statute of limitations begins to run when a plaintiff discovers that an injury has occurred, not when he has been able to discover all of the relevant facts. *See Security Bank & Trust Company of Ponca City, OK. v. Fabricating, Inc.*, 673 S.W.2d 860 (Tenn.1983). In the Court's opinion, even if the statute of limitations could be considered tolled until Mr. Crabtree's cooperation in December of 1985, there is absolutely nothing to justify the fact that the cause of action with regard to the Ridge Scheme was not plead until October of 1987.

It would appear that the third amended complaint alleges no specific damages not already redressed by the Bankruptcy Court and that all malpractice-related claims except those relating to the escrow transaction are time-barred. They were probably time-barred before SIBC ever filed in bankruptcy, but, even if not barred at that time, they still were not plead within a year from when they were, or should have been discovered. KMH & F's motion for summary judgment is well taken and will be granted.

IV. *Summary.*

In light of the foregoing findings of fact and conclusions of law, the Court makes the following rulings:

1) KMH & F's motion to dismiss the bankruptcy appeal on the ground that the Bankruptcy Court lacked jurisdiction over the action is DENIED.

2) The Bankruptcy Court's findings of liability for the fraudulent transfer and the preference are AFFIRMED, but the judgment against KMH & F is reduced to $359,-101.60.

3) This Court's previous decision to dismiss SIBC's second amended complaint (the securities fraud claims) is not changed. And,

4) KMH & F's motion for summary judgment on SIBC's first and third amended complaints (the malpractice-related theories) is hereby GRANTED.