FAY, Circuit Judge:
 

 This case involves an attempt by Paul C. Nordberg, as trustee for the estate of Chase & Sanborn Corporation (“C & S”), to avoid a $500,000 transfer as a constructively fraudulent one.
 
 [1]
 
 According to Nord-
 
 *1197
 
 berg, defendant Societe Generale was the initial transferee of the $500,000, which C & S wired into Colombian Coffee Corporation, Inc.’s (“Colombian Coffee”) Societe Generale account. Therefore, Nordberg argues that the bank should be forced to return the amount to the estate.
 
 [2]
 

 The United States Bankruptcy Court for the Southern District of Florida heard the case. The bankruptcy court assumed without deciding that the $500,000 transfer constituted a section 548 fraudulent conveyance.
 
 In re Chase & Sanborn Corp.,
 
 68 B.R. 530, 532 (Bkrtcy.S.D.Fla.1986) (“Chase & Sanborn”). The court, however, did not permit Nordberg to recover the conveyance from Societe Generale. The bankruptcy court found that Societe Generale was not an initial transferee. Instead, the court held, Societe Generale was merely a commercial conduit of the funds. Therefore, 11 U.S.C. § 550(a) (1982 & Supp. IV 1986)— which lists those parties against whom a trustee can seek recovery — does not permit Nordberg to recover the money from Societe Generale.
 
 Chase & Sanborn,
 
 68 B.R. at 532.
 

 Nordberg appealed to the United States District Court for the Southern District of Florida. That court affirmed the bankruptcy court order in an opinion which adopted the bankruptcy court’s reasoning. Nord-berg then filed this appeal in our court. We find that the bankruptcy court was correct in concluding that Societe Generale was a commercial conduit, and we affirm.
 

 I.
 
 BACKGROUND
 

 Societe Generale is a French bank which has a branch office located in New York City. Colombian Coffee Corporation, Inc. (“Columbian Coffee”) had a demand deposit account with Societe Generale’s New York branch during the time in question. The activities that are at the center of the case before us involve this account.
 

 A.
 
 The Clearing House System as it Relates to this Case
 

 All checks drawn on accounts established with Societe Generale in New York must be processed through the New York Clearing House (“clearing house”) system. When a check drawn on a Societe Generale account arrives at the clearing house for payment, Citibank, Societe Generale’s clearing bank, pays the check and debits Societe Gene-rale’s account by that amount. Citibank does this automatically, without considering the status of the account on which the check is drawn.
 
 [3]
 

 If there are insufficient funds to cover a check drawn on the account, the payment of the check automatically creates an overdraft on paper. In reality, however, So-ciete Generale has taken no action regarding the check at this point. Societe Gene-rale actually has until noon of the following business day to inform the clearing house whether it will honor or return the check.
 
 [4]
 
 Societe Generale’s internal rules require account officers to reach a decision by 10 a.m., so that it can meet the clearing house’s noon deadline.
 

 B.
 
 Societe Generale’s Procedure Regarding Colombian Coffee Overdrafts
 

 Some Societe Generale accounts have special provisions that allow the account-
 
 *1198
 
 holders to write checks for which there are insufficient funds. If such a check is presented to the bank, the bank will automatically honor it despite the overdraft it creates in the account. Colombian Coffee, however, did not have any such understanding with Societe Generale regarding its overdrafts. Instead, because Societe Generale was aware of Colombian Coffee’s financial difficulties, it monitored Colombian Coffee’s account quite closely. Whenever Societe Generale became aware of an overnight overdraft, it first called Colombian Coffee to make sure that they were depositing sufficient funds to cover the check. Colombian Coffee would tell So-ciete Generale how much money was on the way and which bank was sending the money. Societe Generale would then contact the bank, which would confirm the information by telex or by telephone. It was only after receiving a confirmation from the bank in question that Societe Generale would honor the check.
 

 C.
 
 Facts
 

 On November 29, 1982, a check for $1,747,403.00, drawn on Colombian Coffee’s account with Societe Generale and payable to Banco Popular Bogota (“Banco Popular”), arrived at the clearing house for payment. Payment of the check created an automatic overdraft of $1,033,135.07 in the Colombian Coffee account.
 

 When Societe Generale learned of the overdraft, it presumably followed its customary procedure and checked with Colombian Coffee to find out whether they were depositing sufficient funds to cover the check. Colombian Coffee apparently informed the bank that two wire transfers were coming from Credit Lyonnais Panama —one for $500,000, and another for $700,-000.
 
 [5]
 
 A corporate assistant at Societe Generale prepared an internal advice indicating that the money was indeed being transferred into the Colombian Coffee account by Credit Lyonnais and recommending that, because of this transfer, the bank should honor the check.
 

 At the time that Societe Generale honored the check, however, the wire transfer had not yet arrived at the bank. Thus, Societe Generale listed an overdraft in Colombian Coffee’s account from November 29 until November 30.
 
 [6]
 
 Societe Generale charged Colombian Coffee’s account for this overdraft for the day of November 29, at a rate of 12.25% per annum. The charge amounted to $351.51. Deposition of Richard Magid at 58.
 

 A credit ticket recording the wire transfer indicates that Societe Generale received the funds from Credit Lyonnais shortly after 4:00 p.m. on November 30. The funds came from C & S’s account with Credit Lyonnaise. Approximately six months later, C & S filed for bankruptcy. Nordberg subsequently filed this suit against Societe Generale, seeking to avoid the $500,000 transfer as a fraudulent conveyance.
 

 II.
 
 ANALYSIS
 

 In order to recover the $500,000 from Societe Generale, Nordberg would have to establish two things. First, Nordberg would have to establish that there had been a section 548 fraudulent transfer. After making this showing, Nordberg would have to prove that Societe Generale is a party from whom he may seek recovery under section 550. Section 550 allows a trustee to recover the fraudulently transferred property from the initial transferee, the entity for whose benefit the transfer was made, or a subsequent transferee of the initial transferee. 11 U.S.C. § 550(a) (1982 & Supp. IV 1986).
 

 The bankruptcy court assumed without deciding that Nordberg proved fraud.
 
 [7]
 
 We
 
 *1199
 
 will also assume this point without deciding it, and will focus our analysis on the key issue in this case: the status of Societe Generale in the context of this transaction.
 

 Before discussing the specifics of the case, however, we must deal with an important issue. In
 
 In re Chase & Sanborn Corp.,
 
 813 F.2d 1177 (11th Cir.1987), our court adopted the control test to determine whether a debtor had possession of property allegedly recoverable under section 548. Nordberg argues that the bankruptcy court erred in failing to apply the control test to the instant case. We agree that
 
 In re Chase & Sanborn Corp.
 
 establishes a general framework for analysis that can be utilized in this case.
 

 In
 
 In re Chase & Sanborn Corp.,
 
 a trustee in bankruptcy attempted to avoid a transfer as a fraudulent conveyance.
 
 [8]
 
 The issue which troubled our court was not whether the property went
 
 to
 
 the alleged transferee, but whether it came
 
 from
 
 the debtor, the alleged transferor. The debt- or corporation, already defunct, had been reopened just for the purpose of laundering the funds. The debtor reopened its account; another party deposited funds into the debtor’s account; the debtor gratuitously transferred the money to a third party; and, the debtor closed the account.
 
 Id.
 
 at 1179. Our court ruled that the trustee could not recover the funds because, “[ajlthough the debtor corporation had possession of the funds in controversy by virtue of the transfer to the account, the record demonstrates that the debtor corporation did not have sufficient control over the funds to warrant a finding that the funds were the debtor corporation’s property.”
 
 Id.
 
 at 1180. In so holding, our circuit applied the control test, previously used by other circuits in the context of avoidable preferences,
 
 see
 
 11 U.S.C. § 547 (1982 & Supp. IV 1986), to determine whether a debtor had possessed property allegedly recoverable under section 548. The test articulated by our court is a very flexible, pragmatic one; in deciding whether debtors had controlled property subsequently sought by their trustees, courts must “look beyond the particular transfers in question to the entire circumstance of the transactions.”
 
 In re Chase & Sanborn Corp.,
 
 813 F.2d at 1181-82.
 

 The control test, then, as adopted by this circuit, simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable. This approach is consistent with the equitable concepts underlying bankruptcy law.
 
 See Bank of Marin v. England,
 
 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966) (noting that “equitable principles govern the exercise of bankruptcy jurisdiction”);
 
 In re Chase & Sanborn Corp.,
 
 835 F.2d 1341, 1349 (11th Cir.1988);
 
 Coffee II,
 
 75 B.R. at 179-80. We feel that the general approach outlined in
 
 In re Chase & Sanborn Corp.
 
 applies regardless of whether a court is attempting to determine whether a debtor controlled the transferred funds it transferred to a defendant
 
 or
 
 a defendant gained control over the funds transferred to it.
 

 We are not creating new law, or even expanding on the existing doctrine. Bankruptcy courts considering the question of whether a defendant is an initial transferee have traditionally evaluated that defendant’s status in light of the entire transaction. And, in the past, courts have refused
 
 *1200
 
 to allow trustees to recover property from defendants who simply held the property as agents or conduits for one of the real parties to the transaction.
 
 [9]
 
 Had these courts employed an overly literal interpretation of section 548, they could have allowed the trustees to recover the funds from the defendants. Instead, they determined that, although technically the defendants had received the funds from the debtors and could be termed “initial transferees,” the defendants had never actually
 
 controlled
 
 the funds and therefore it would be inequitable to allow recovery against them.
 
 See also In re Colombian Coffee Co., Inc.,
 
 62 B.R. 542, 544 (Bkrtcy.S.D.Fla.1986) (defendant bank neither initial transferee nor beneficiary where third party had received funds and then transferred them to defendant; instead, third party was initial transferee because funds had been “the property of that entity under [its] absolute control”),
 
 aff'd,
 
 75 B.R. 177 (S.D.Fla.1987).
 
 [10]
 

 When trustees seek recovery of allegedly fraudulent conveyances from banks, the outcome of the cases turn on whether the banks actually controlled the funds or merely served as conduits, holding money that was in fact controlled by either the transferor or the real transferee. Thus, where a bank receives money from a debtor to pay off a debt owed to the bank, courts have found that the bank gained control of the funds and have allowed recovery against the bank.
 
 E.g., Matter of Prescott,
 
 51 B.R. 751, 755-56 (Bkrtcy.W.D. Wis.1985),
 
 reinstated,
 
 805 F.2d 719 (7th Cir.1986);
 
 see also Bonded Financial Services v. European American Bank,
 
 838 F.2d 890, 892, 895-96 (7th Cir.1988)
 
 (“Bonded”)
 
 (if money had been sent to bank and earmarked for purpose of reducing a loan, then bank would have been initial transferee). When banks receive money for the sole purpose of depositing it into a customer’s account, on the other hand, the bank never has actual control of the funds and is not a section 550 initial transferee.
 
 E.g., Coffee II,
 
 75 B.R. at 178-79. This is true even when, after a bank deposits the money into a customer’s account, the customer gives the money to the bank to pay off a debt that it owes to the bank.
 
 See Bonded,
 
 838 F.2d at 892.
 
 [11]
 

 We now consider the issue in light of the facts of this case. Citibank’s automatic payment of the Colombian Coffee check on November 29 created an overdraft on paper. Societe Generale’s decision to honor the check on November 30 extended the period of time during which that overdraft existed until the next day. Overdrafts have traditionally been considered debts. Hersbergen,
 
 Banking Law,
 
 44 La. L.Rev. 247, 261 n. 86 (1983);
 
 see Matter of Prescott,
 
 51 B.R. at 755;
 
 Caddo Trust & Savings Bank v. Bush,
 
 182 So. 397, 398 (La.App.2d Cir.1938). If we determine that the paper overdraft created by the events of November 29 and November 30 constituted a
 
 debt
 
 owed to Societe Generale by Colombian Coffee, then the money wired to Societe Generale — for the express purpose
 
 *1201
 
 of paying off the overdraft — would actually have been sent to Societe Generale. If this is the case, then Societe Generale had actual control of the funds when it received the money from C & S, and Nordberg can recover the money from the bank. If, on the other hand, there was no real debtor-creditor relationship, then the bank merely deposited the funds into Colombian Coffee’s account, and Colombian Coffee used that money to pay the check to Banco Popular. When viewed in that manner, Societe Generale functioned as a conduit, receiving the funds and depositing them into the Colombian Coffee account. Then, Nordberg would be unable to recover the money from Societe Generale.
 

 The bankruptcy court in the instant case concluded that the transaction at issue did not create a real debt. The court found it “more realistic to view this transaction ... as being simultaneous.... If they were simultaneous, the bank never became any kind of transferee of this debtor under any view of § 550.”
 
 Chase & Sanborn,
 
 68 B.R. at 532. Instead, the bankruptcy court determined that the bank was a conduit that “credit[ed] Colombian Coffee’s account with the transferred funds expressly earmarked for that purpose.”
 
 Id.
 
 We find that there is ample evidence in the record to support the finding that the transaction was effectively simultaneous.
 

 In addition to the fact that the transaction was virtually simultaneous, we find it significant that Societe Generale only honored the check because it knew with absolute certainty that Credit Lyonnaise had wired enough money to cover the check.
 
 [12]
 
 Thus, the bank did not honor the check “in the faith that the next day or two’s deposits would right the balance.”
 
 Matter of Prescott,
 
 51 B.R. at 753. Societe Generale did not have such faith in Colombian Coffee, and relied instead on the
 
 guarantee
 
 of another bank that funds were on the way. We do not believe that, in this situation, Societe Generale viewed itself as a creditor that had loaned over a million dollars to Colombian Coffee.
 

 Societe Generale did charge Colombian Coffee interest for the day of November 29. According to Societe Generale, however, the charge reflected the costs incurred due to the paper overdraft created when Citibank debited the Societe Generale account. This occurred before Societe Generale had decided whether or not to honor the check and, the bank declares, would have been charged regardless of whether it had decided to honor or bounce the check the following day. We find this explanation persuasive. Charges for handling such administrative matters are routine. The fact that a charge was made is not significant enough to warrant a finding that the bankruptcy court’s assessment of the transaction was erroneous.
 

 III.
 
 POLICY CONSIDERATIONS
 

 Fraudulent conveyance law necessarily takes competing interests into account. Trustees are allowed to avoid certain transfers as fraudulent because these transfers harm the creditors of the bank.
 
 In re Chase & Sanborn Corp.,
 
 813 F.2d at 1181; Baird & Jackson,
 
 Fraudulent Conveyance Law and Its Proper Domain,
 
 38 Vand.L. Rev. 829, 834 (1985). At the same time, there are limits on the types of transfers that are avoidable. Some of these limits have been set because of a determination that it is not fair to allow a trustee to recover from certain parties.
 
 See, e.g.,
 
 11 U.S.C. § 550(b) (1982 & Supp. IV 1986) (exception carved out for subsequent transferees that take for value, in good faith, and without knowing that the transfer is avoidable, and for good faith transferees of these transferees). The refusal to hold conduits or agents liable under section 550 reflects a similar determination.
 

 It is especially inequitable to hold conduits liable in situations in which the conduits cannot always ascertain the identity of the transferror.
 
 See In re Auto-Pak, Inc.,
 
 73 B.R. 52, 54 (D.D.C.1987) (where IRS had no way of knowing identity of party who purchased cashier’s check, “[i]t would defy logic to hold ... the IRS a
 
 *1202
 
 party to this alleged fraudulent conveyance”). As one bankruptcy court pointed out, a bank does not always know the identity of the party sending a wire transfer.
 
 Coffee I,
 
 59 B.R. at 645;
 
 see also
 
 deposition of Warren Schad at 57 (wire transfer order often, but not always indicates source of funds). If we were to find that “a bank must at its peril examine the source of the wired funds, determine its solvency and verify the consideration it received before the bank honors the transfer,” it would impose an unfair burden on the banks and would severely impair the wire transfer system.
 
 Coffee I,
 
 59 B.R. at 645. We do not believe that this is the result that Congress had in mind when it created the law regarding fraudulent conveyances.
 

 IV.
 
 CONCLUSION
 

 As the Supreme Court has noted in another context, “[t]his system could easily fall of its own weight if courts or scholars become obsessed with hair-splitting distinctions” and lose sight of the real purpose of the laws being applied.
 
 United States v. Bailey,
 
 444 U.S. 394, 406-07, 100 S.Ct. 624, 633, 62 L.Ed.2d 575 (1980). It is especially important to consider the goal of a law, and the effect of a particular ruling, in areas of law such as bankruptcy jurisdiction that are so strongly rooted in equitable principles. After stepping back and viewing the transaction as a whole, we conclude that, in this instance, Societe Generale’s decision to honor Colombian Coffee’s check did not establish a debtor-creditor relationship between Colombian Coffee and Societe Gene-rale. Under the particular facts of this case, the transaction does not fall within the provisions of the bankruptcy law on voidable transfers.
 

 AFFIRMED.
 

 [1]
 

 . According to 11 U.S.C. § 548(a)(2) (1982 & Supp. IV 1986), a transfer made within one year before the filing of the bankruptcy petition is constructively fraudulent if (1) the debtor transferred the property when the debtor was either insolvent or had reason to believe that the trans
 
 *1197
 
 fer would cause or hasten insolvency; and (2) the debtor did not receive "reasonably equivalent value” for the transfer. A trustee need not prove fraudulent intent for the purposes of this section.
 
 See
 
 Ayer,
 
 How to Think About Bankruptcy Ethics,
 
 60 Am.Bankr.LJ. 355, 371-72 (1986) (motive for avoiding fraudulent transfers rests more and more completely on notions of fairness to creditors, and less and less on notions of wrongdoing).
 

 [2]
 

 .See
 
 11 U.S.C. § 550 (1982 & Supp. IV 1986) (listing parties against whom a trustee may recover property once the trustee establishes a section 548 fraudulent conveyance). Nordberg did not proceed against Colombian Coffee Corporation, Inc. ("Colombian Coffee”), against whom recovery may have been possible, because Colombian Coffee is also insolvent.
 
 See
 
 Appellant’s Brief at 3 note *.
 

 [3]
 

 . The only exceptions to this rule arise when the check is facially deficient — for example, when the check has not been signed.
 

 [4]
 

 . These are the only two choices a bank has; it cannot, for example, put off its decision until the following day.
 

 [5]
 

 . The |700,000 transfer is not at issue in the case before us.
 

 [6]
 

 . The records do not indicate exactly what time the overdraft was removed from the account.
 

 [7]
 

 . By not deciding whether section 548 had been satisfied, the court sidestepped the question of reasonably equivalent value. Under the code, the debtor can only avoid a transfer in those cases in which the debtor did not receive equivalent value for the property transferred.
 
 See
 
 11 U.S.C. § 548(a)(2) (1982 & Supp. IV 1986).
 

 In the case at hand, C & S wired $500,000 into Colombian Coffee’s account although C & S did not owe money to any of the parties involved in
 
 *1199
 
 the transaction. On the surface, then, the transfer seems to have been made for less than equivalent value.
 
 Cf. Durrett v. Washington Natl. Ins. Co.,
 
 621 F.2d 201 (5th Cir.1980) (transfer for less than 57.7 percent of fair market value not for equivalent value).
 

 When one looks beyond the surface, however, the situation becomes more complicated. For, C & S and Colombian Coffee were both owned by Alberto Duque Rodriguez.
 
 See In re Colombian Coffee Co., Inc.,
 
 59 B.R. 643, 644 (Bkrtcy S.D.Fla.1986)
 
 (Coffee I"), aff’d, 75
 
 B.R. 177 (S.D.Fla.1987)
 
 ("Coffee II").
 
 And, when the debtor making an allegedly fraudulent transfer is closely related to the party benefitting from the transfer, courts have often found reasonably equivalent value based simply on the benefit to the latter party. These courts reason that
 
 that
 
 benefit confers an indirect but equally real benefit to the debtor.
 
 E.g., In re Lawrence Paperboard Corp.,
 
 76 B.R. 866, 871-72 (Bkrtcy.D.Mass.1987);
 
 see also In re Duque Rodriguez,
 
 77 B.R. 937, 939 (BkrtcyS.D.Fla.1987) (stating principle but reaching contrary result).
 

 [8]
 

 . The trustee and debtor involved in that case were the same as those involved in this one.
 

 [9]
 

 .See, e.g., Coffee II, 75
 
 B.R. at 178-79 (funds sent to defendant bank to deposit in third party's account);
 
 In re Black & Geddes, Inc.,
 
 59 B.R. 873, 874 (Bkrtcy.S.D.N.Y.1986) (defendant steamship agency collected funds in capacity as agent for another party);
 
 In re Fabric Buys of Jericho, Inc.,
 
 33 B.R. 334, 335 (Bkrtcy.S.D.N.Y.1983) (debtor gave defendant law firm funds to hold in escrow for third party). Similarly, when courts have concluded that the defendant did control the funds, they have held the defendant liable.
 
 E.g., In re Mill Street, Inc.,
 
 71 B.R. 670, 671-72 (Bkrtcy.N.D.Cal.1987) (collection agency that sued and collected funds from debtor and was legal owner of the claim against debtor was more than mere conduit).
 

 [10]
 

 . In the case before us, the bankruptcy court wrote a thoughtful order which also implicitly applied a control analysis.
 

 [11]
 

 . In
 
 Bonded,
 
 the court decided that the bank was a subsequent rather than initial transferee.
 
 See Bonded,
 
 838 F.2d at 896. The bankruptcy court in the instant case suggested that, if the bank is deemed a transferee, it is a subsequent transferee. In that case, 11 U.S.C. § 550(b) (1982 & Supp. IV 1986) would prevent Nordberg from obtaining recovery against the bank. We do not reach this issue because we agree with the bankruptcy court's conclusion that Societe Generale is not a transferee at all.
 

 [12]
 

 . According to a former officer of Societe Generale, a transferor bank’s confirmation virtually guarantees that the funds are forthcoming. Deposition of Warren Schad at 154.