SOUTHMARK CORPORATION,
Appellant,

v.

SCHULTE, ROTH & ZABEL,
L.L.P., Appellees.

Civ.A. No. 3:97–CV–2332L.

United States District Court,
N.D. Texas,
Dallas Division.

Nov. 17, 1999.

Larry Chek, Jenkens & Gilchrist, Dallas, TX, for Southmark Corp., Appellant.

Robin E. Phelan, Judith Elkin, Haynes & Boone, L.L.P., Dallas, TX, for Schulte Roth & Zabel, appellee.

### MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

This action is an appeal of a Final Order of Dismissal, entered by the bankruptcy court on August 28, 1997, dismissing Appellant Southmark Corporation's ("Southmark") preference claim for recovery of $1,000,000 against Appellees Schulte, Roth & Zabel L.L.P. ("SR & Z"). SR & Z cross-appeals certain findings of fact and conclusions of law contained in the bankruptcy court's related Memorandum Opinion and Order entered August 13, 1997 and certain findings of fact and conclusions of law contained in a separate Memorandum Opinion and Order dated March 24, 1997 granting Southmark's Motion for Summary Judgment.

### I. Factual and Procedural Background

#### A. Factual Background

The relevant facts in this case are undisputed. Prior to filing bankruptcy in 1989, Southmark was a publicly-owned corporation engaged in the business of real estate-related syndications and investments. In December 1988, the Parks Group, a group of discontented minority-interest shareholders of Southmark, hired SR & Z, a New York law firm, to represent it in a proxy contest for control of Southmark. The Parks Group was comprised of Herbert B. Parks, Byron Investments, Inc. ("Byron"), Garson L. Rice, and R & P Ventures ("R & P").[1] In connection with the proxy contest, the Parks Group and Southmark initiated a number of lawsuits against one another in state and federal courts. SR & Z represented the Parks Group in the proxy contest and related litigation.

In May 1989, Southmark entered into a settlement agreement with the Parks Group, wherein it agreed to reimburse the group in the amount of $ 3.3 million[2] for costs and expenses, including attorneys fees, incurred by the group in connection with the proxy contest and related lawsuits. The Southmark/Parks Group Settlement Agreement ("Settlement Agreement") also gave the Parks Group a minority position on Southmark's board of directors and certain corporate governance features.

On May 24, 1989, a few hours before execution of the Settlement Agreement, Southmark transferred $3.3 million by wire to SR & Z's general operating bank

---

1. Southmark has since settled its claims with the Parks Group, and SR & Z remains as the sole defendant in this action.

2. In the Settlement Agreement, the Parks Group represented that the $ 3.3 million was a good faith estimate of its out-of-pocket costs and expenses incurred in connection with activities involving Southmark, including, inter alia, legal fees.

account at Citibank, N.A. ("Citibank") in New York. SR & Z held the funds in its general operating account as an escrow agent, in that it agreed to return the funds to Southmark if Southmark and the Parks Group failed to fully execute the Settlement Agreement. Southmark and the Parks Group executed the Settlement Agreement later that same day.

On May 25, 1989, pursuant to SR & Z's instructions, Citibank transferred by wire the $3.3 million that SR & Z held in escrow to R & P's account at First Union National Bank in North Carolina ("First Union"). At the time of the $3.3 million transfer, the R & P account had a balance of $10,675.44. On that same day, R & P drew a check on its First Union account for $1 million payable to "Byron Investments/Branch Banking & Trust Account". Meanwhile on the same day, Byron—another member of the Parks Group—drew a $1 million check on its account at Branch Banking & Trust Company ("BB & T"), payable to SR & Z in payment of SR & Z's legal fees. That check was sent to SR & Z in New York by overnight delivery.

On May 26, 1989, Byron received the $1 million check from R & P and deposited the check in its account at BB & T. At the time of the $1 million deposit, Byron's BB & T account was overdrawn by $70,010.17. Also on that same day, SR & Z received the $1 million check from Byron and deposited that check in its general operating account at Citibank. Citibank allowed SR & Z use of the funds on that day.

On May 29, 1989, R & P drew a second check on its account at First Union payable to Byron in the amount of $975,000. This check was deposited in and credited to Byron's BB & T account on May 30, 1989. In addition, both the $1 million check from R & P to Byron and the $1 million check from Byron to SR & Z cleared their respective accounts on May 30. The balance in the BB & T account on that day was $805,676.71. The $975,000 check from R & P to Byron cleared R & P's account on May 31, 1989.

Except for the checks described herein, no other material deposits were made in the First Union or BB & T accounts between May 25, 1989, and May 30, 1989.[3] Southmark filed its bankruptcy petition on July 14, 1989.

### B. *Procedural History*

 Southmark filed the original complaint underlying this appeal on June 19, 1991. Southmark initially brought this action against the Parks Group and SR & Z. In its original complaint, Southmark sought to recover, *inter alia*, a $3.3 million pre-petition transfer of settlement funds to R & P as an avoidable preference under 11 U.S.C. § 547(b).[4] Defendants claimed that no preferential transfer occurred and asserted affirmative defenses under 11 U.S.C. § 547(c)(1) and (2).[5] The bankrupt-

---

**3.** Byron's bank statement of its account at BB & T provides a summary of deposits made to the account between May 26–30, 1989. With the exception of deposits in the amount of $1 million and $975,000, the only other deposit made to the account during this period of time was a deposit in the amount of $50.

**4.** Pursuant to 11 U.S.C. § 547(b), bankruptcy trustees are authorized to "avoid any transfer of an interest of the debtor in property" when certain conditions are satisfied. The elements of a voidable preference are that it 1) benefit a creditor; 2) be on account of antecedent debt; 3) be made while the debtor is insolvent; 4) be made within 90 days before bankruptcy; and 5) enable the creditor to receive a larger share of the estate than if the transfer had not been made. 11 U.S.C. § 547(b); *In*

*re El Paso Refinery, LP,* 171 F.3d 249, 253 (5th Cir.1999).

**5.** The relevant portion of the statute provides as follows:

(c) The trustee may not avoid under this section a transfer—
(1) to the extent that such transfer was—
(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange;
(2) to the extent that such transfer was—
(A) in payment of a debt incurred by the debtor in the ordinary course of business

cy court initially granted summary judgment for Defendants holding that the $3.3 million was not transferred for or on account of an antecedent debt[6] owed by Southmark, and therefore, could not be recovered as a preference under 11 U.S.C. § 547(b). The district court affirmed.

Southmark appealed the district court's order affirming, *inter alia,* the bankruptcy court's ruling that the $3.3 million transfer was not recoverable as a preference. The Fifth Circuit held that the Parks Group's demand for costs and fees, which was made prior to execution of the Settlement Agreement between the Parks Group and Southmark, was both a claim and antecedent debt for purposes of the Bankruptcy Code. *Southmark Corp.,* 88 F.3d at 317. Accordingly, the Fifth Circuit reversed and remanded the action for further proceedings to determine whether, in light of the Fifth Circuit's opinion, a preferential transfer occurred.

On remand, the bankruptcy court granted summary judgment for Southmark holding that Southmark had established a preferential transfer under 11 U.S.C. § 547(b). The bankruptcy court denied SR & Z's preference defense under 11 U.S.C. § 547(c)(1) concluding that the transfer was not intended by debtor and creditor to be a contemporaneous exchange for new value, but found that genuine issues of material fact remained for trial on whether the transfer occurred in the ordinary course of business and whether SR & Z was a "subsequent transferee" of $1 million of the $3.3 million transfer from Southmark to R & P within the meaning of 11 U.S.C. § 550.

The bankruptcy court conducted a trial June 24, 1997, and issued its Memorandum Opinion and Order containing the court's findings of fact and conclusions of law on August 13, 1997. The bankruptcy court concluded that SR & Z failed to establish that the preferential transfer occurred in the ordinary course of business and dismissed SR & Z's defense under 11 U.S.C. § 547(c)(2). The bankruptcy court also determined that SR & Z was not a subsequent transferee under 11 U.S.C. § 550(a)(2) and, therefore, not liable to Southmark for the $1 million it received from Byron in payment of SR & Z's legal fees. The bankruptcy court, however, determined that if SR & Z was a subsequent transferee, it would be unable to prevail defensively under 11 U.S.C. § 550(b) because it had knowledge of the voidability of the preferential transfer. The bankruptcy court further found that if Southmark obtained a money judgment against SR & Z, SR & Z would be entitled to assert a claim against the bankruptcy estate under 11 U.S.C. § 502(h), and the common law doctrines of subrogation and third-party beneficiary. Finally, the bankruptcy court concluded that if an appellate court awarded judgment in favor of Southmark because it finds that SR & Z was a subsequent transferee, that judgment would be offset by the dollar value of the Southmark plan dividend on a claim that SR & Z would assert against Southmark in the bankruptcy case.

## II. *Issues*

The issues presented on appeal are as follows:

1) whether SR & Z is a subsequent transferee within the meaning of 11 U.S.C. § 550, and if so, for what amount is SR & Z liable;

2) whether SR & Z is entitled to assert a claim against Southmark in its bankruptcy case if Southmark does

---

or financial affairs of the debtor and transferee;
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms.

**6.** "A debt is antecedent if it is incurred before the transfer." *Southmark Corp. v. Schulte Roth & Zabel,* 88 F.3d 311, 316 (5th Cir.1996) (citation omitted).

obtain a money judgment from SR & Z;

3) whether SR & Z can prevail on its statutory defenses under 11 U.S.C. § 547(c)(1) and (2) and under 11 U.S.C. § 550(b)(1); and

4) whether Southmark may be allowed to pay any claim of SR & Z in the bankruptcy case in a manner other than pursuant to Southmark's confirmed plan of reorganization.

## III. *Analysis*

### A. *Standard of Review*

On appeal before the district court, "[a] bankruptcy court's findings of fact are subject to clearly erroneous review, while its conclusions of law are reviewed de novo." *In re Pro–Snax Distributors, Inc.,* 157 F.3d 414, 420 (5th Cir.1998). Fact findings are reversed only if, based on the entire evidence, the court is left with a definite and firm conviction that a mistake has been made. *In re Young,* 995 F.2d 547, 548 (5th Cir.1993).

### B. *SR & Z's Subsequent Transferee Status Under § 550(a)(2)*

Southmark contends that the bankruptcy court erred when it found that SR & Z was not a subsequent transferee, within the meaning of 11 U.S.C. § 550(a)(2), of $1 million of the $3.3 million transferred to R & P pursuant to the terms of the Settlement Agreement. In reaching its conclusion, the bankruptcy court relied upon a "date of delivery" test often used by courts to determine whether a preferential transfer made by check may be excepted from avoidance pursuant to the "ordinary course of business" defense provided by 11 U.S.C. § 547(c)(2). *See Braniff Airways, Inc. v. Midwest Corp.,* 873 F.2d 805, 807–808 (5th Cir.1989). Southmark argues that a "time of delivery" check transfer rule is inappli-

cable in a § 550 analysis. The court agrees.

As articulated by the Supreme Court, the "ordinary course of business" exception allowed under 11 U.S.C. § 547(c)(2) is "designed to encourage creditors to continue to deal with troubled debtors on normal business terms by obviating any worry that a subsequent bankruptcy filing might require the creditor to disgorge as a preference an earlier received payment." *Barnhill v. Johnson,* 503 U.S. 393, 402, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) (citation omitted). Prior to the elimination of the 45 day requirement, timing was critical in determining whether a transfer occurred within the ordinary course of business.[7] No such inquiry, however, is necessary to determine from which party the trustee may recover an avoided transfer. Therefore, the court finds that the bankruptcy court erred in applying a "date of delivery" test to determine SR & Z's subsequent transferee status.

Code Section 550 prescribes the rights and liabilities of a transferee of an avoided transfer, and authorizes the trustee to recover the property or value of the property transferred. 11 U.S.C. § 550(a). As such, § 550 stands as a recovery statute rather than a primary avoidance basis for action, and provides an avenue of recovery for the trustee who prevails under an avoidance section of the Code. *Santee v. Northwest Nat'l Bank (In re Mako, Inc.),* 127 B.R. 471, 473 (Bankr.E.D.Okl.1991). A trustee's ability to recover is independent from the ability to avoid the transfer. *Id.* Subsection (a) permits a trustee to recover property transferred, or value of the property transferred, from the initial transferee of an avoided transfer or any immediate or mediate transferee ("subsequent transferee") of the initial transferee.

---

**7.** Section 547(c)(2) previously had a requirement that, in order for a payment by the debtor to qualify as a payment in the ordinary course of business, such payment had to have been made within 45 days of when the under-

lying debt was first incurred. *Barnhill,* 503 U.S. at 402 n. 9, 112 S.Ct. 1386. That requirement has since been eliminated. *Id.* (citation omitted).

11 U.S.C. § 550(a)(1) and (2). A trustee's recovery of property, however, may be circumvented by a subsequent transferee who takes for value, in good faith, and without knowledge of the avoidability of the transfer. 11 U.S.C. § 550(b)(1).

■■■■ The term "transferee" is not defined in the Bankruptcy Code; however, the Fifth Circuit has adopted a "dominion or control" test to determine whether a party is an "initial transferee" of a preferential transfer for purposes of § 550(a). *See Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141 (5th Cir.1993). Under the dominion or control test, a party is not considered an initial transferee of a transfer received directly from the debtor unless that party gains actual dominion or control over the funds. *Id.* (citing *Bonded Financial Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988)). When an intermediary party receives but does not gain actual dominion or control over the funds, that party is considered a mere conduit or agent for one of the real parties to the transaction. *Brunson*, 984 F.2d at 141 n. 3; *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1200 (11th Cir.1988). Dominion or control over the money or other asset means having the right to put the money to one's own use for whatever purpose the recipient so desires. *Coutee*, 984 F.2d at 141 (citing *Bonded*, 838 F.2d at 893); *Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544, 548 (9th Cir.1991). An application of the dominion or control test requires the court to "step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." *Nordberg*, 848 F.2d at 1199.

In this case, to determine whether SR & Z is a subsequent transferee from whom Southmark may recover, the court must first consider whether SR & Z received any portion of the avoided $3.3 million preferential transfer from the initial transferee or any other subsequent transferee

of the avoided transfer. For the reasons that follow, the court finds that SR & Z was a subsequent transferee within the meaning of § 550(a)(2).

■■■■ The parties have stipulated that on May 24, 1989, Southmark transferred $3.3 million to SR & Z's general operating account at Citibank and SR & Z held those funds as an escrow agent. As such, SR & Z served as a conduit and was not the initial transferee of the funds within the meaning of § 550(a). *See Brunson,* 984 F.2d at 141. It is also undisputed that on May 25, 1989, Citibank, with instructions from SR & Z, transferred by wire $3.3 million from SR & Z's general operating account to R & P's account at First Union. Southmark contends that when a bank receives funds for the sole purpose of depositing the money into its customer's account, the bank is not a transferee under § 550. The court agrees. The court finds that like SR & Z in its capacity as an escrow agent, neither Citibank nor First Union had a legal right to put any of the funds transferred to its own use. As such, the court finds that Citibank and First Union lacked the requisite dominion over the funds to be an initial transferee under § 550(a).

■■■■ The first party to gain dominion or control over the $3.3 million transfer was R & P. It is undisputed that R & P used the funds for its own benefit. The evidence establishes that R & P intended for at least $1 million of the funds to be used on behalf of the Parks Group to pay SR & Z's legal fees. Thus, the court finds that R & P was the initial transferee of the $3.3 million transfer pursuant to the terms of the Settlement Agreement.

■■■■ The court next determines whether Byron was an immediate transferee of any portion of the $3.3 million transfer to R & P. What constitutes a transfer and when it is complete is a matter of federal law. *Barnhill,* 503 U.S. at 397, 112 S.Ct. 1386. The Bankruptcy Code defines "transfer" as "every mode, direct or indi-

rect ... of disposing of or parting with property or with an interest in property...." 11 U.S.C. § 101(54). Absent controlling federal law, what constitutes "property" and "interests in property" are creatures of state law. *Barnhill*, 503 U.S. at 398, 112 S.Ct. 1386. In *Barnhill*, the Supreme Court determined that "[f]or purposes of payment by ordinary check, ... a 'transfer' as defined by § 101(54) occurs on the date of honor, and not before." *Id.* at 400, 112 S.Ct. 1386. Relying on the Uniform Commercial Code, the Court found that once a debtor, or drawer of a check, has directed the drawee bank to honor a check and the bank does so, the drawer of the check has implemented a mode of disposing of property or an interest in property in accordance with § 101(54). *Id.*

■ The parties have stipulated that on May 25, 1989, R & P drew a check on its First Union account in the amount of $1 million made payable to "Byron Investments/Branch Banking & Trust." The parties have also stipulated that Byron received the $1 million check from R & P on May 26, 1989, and deposited that check in its account at BB & T. The $1 million check from R & P to Byron cleared the R & P account on May 30, 1989. The evidence establishes that at the time of the $3.3 million wire transfer from SR & Z to R & P, R & P's First Union account had a balance of $10,675.44, and no other deposits were made to the R & P account during the period of May 25, 1989 and May 31, 1989. The evidence establishes that when R & P's $1 million check to Byron cleared R & P's account, the only funds in the account were the remaining funds from the $3.3 transfer from SR & Z to R & P, and $10,675.44, which was the balance in the account at the time of the $3.3 million transfer. Therefore, the court finds that R & P's $1 million check to Byron was more than likely paid out of the $3.3 million transfer from SR & Z to R & P. R & P implemented a mode of disposing of at least $1 million of Southmark's funds when First Union honored the $1 million check

from R & P to Byron. As a result, the court finds that a $1 million transfer from R & P to Byron occurred on May 30, 1989, wherein Byron received a portion of Southmark's property. Therefore, the court concludes that Byron was an immediate or subsequent transferee of Southmark's property within the meaning of § 550(a)(2).

■ The court must next determine whether SR & Z is a subsequent transferee of any portion of Southmark's property. The bankruptcy court determined that SR & Z could not be a subsequent transferee of Southmark's property because Southmark failed to establish that SR & Z actually received any of the funds from the $3.3 million transfer from SR & Z to R & P. The bankruptcy court reasoned that since Byron did not have funds in its account to cover the $1 million check on May 26, 1989, the date the check was received by SR & Z, SR & Z could not be a subsequent transferee of the $3.3 million original transfer. The court further found that any funds that SR & Z received on May 26, 1989, came from Citibank rather than Byron. The court disagrees.

The parties have stipulated that on May 25, 1989, Byron drew a check on its account at BB & T in the amount of $1 million payable to SR & Z for its legal fees. SR & Z received the check on May 26, 1989, and deposited the check in its account at Citibank on that same day. The $1 million check from Byron to SR & Z cleared Byron's BB & T account on May 30, 1989. The evidence establishes that a transfer of Byron's property to SR & Z occurred on May 30, 1989. SR & Z argues that because funds in the BB & T account were commingled with other funds, Southmark cannot establish that SR & Z received any of Southmark's property. The court finds this argument unpersuasive. On May 26, 1989, SR & Z received a $1 million check from Byron, which was deposited in SR & Z's general operating account on that day. The evidence establishes that two substantial deposits were

made to Byron's BB & T account during the period of May 26 and 29, 1989. One deposit was in the amount of $1 million, and the other deposit was in the amount of $975,000. No banking activity was conducted on May 27, 28, 29, 1989, presumably because of the weekend and Memorial Day holiday. The bankruptcy court found that there were no other substantial deposits made to the BB & T account between May 26 and May 30, 1989. Since the BB & T account was overdrawn when the $1 million check from R & P was initially deposited into the BB & T account, there could be no commingling of funds with any other funds in the BB & T account. The $1 million check from R & P covered the amount overdrawn on the account and other outstanding checks leaving a balance of $843,936.69 in the BB & T account on May 26, 1989. On May 29, 1989, R & P drew a second check on its First Union account payable to Byron in the amount of $975,000. Byron received that check on May 30, 1989, and deposited it in the BB & T account that same day. The $1 million check from Byron to SR & Z was also presented to BB & T and paid in full on May 30, 1989. The evidence establishes that the BB & T account had an ending balance on May 30, 1989, of $805,676.71. The court finds that the only funds credited to the BB & T account were funds that R & P had transferred to Byron out of the initial $3.3 million transfer. Further, the evidence establishes that Byron intended to pay SR & Z's legal fees out of funds it received from R & P. Byron wrote a $1 million check to SR & Z, knowing that it did not have the funds in its BB & T account to cover the check. The evidence establishes that Southmark's funds could be traced through the relevant banks to identify SR & Z as a subsequent transferee of $1 million of the $3.3 million avoided preferential transfer. *See CCEC Asset Management Corp. v. Chemical Bank (In re Consolidated Capital Equities Corp.)*, 175 B.R. 629 (Bankr.N.D.Tex.1994).

Once the $1 million check from Byron to SR & Z cleared Byron's BB & T account, Byron implemented a mode of disposing of property. It is undisputed that SR & Z, having considered the check as payment for its legal fees, kept the $1 million and used the funds for its own benefit. The court, therefore, finds that SR & Z was a subsequent transferee within the meaning of § 550(a)(2), and that Southmark is entitled to recover judgment against SR & Z in the amount of $1 million.

The court finds that the bankruptcy court's conclusion that SR & Z was not a subsequent transferee within the meaning of § 550(a)(2) was based on an incorrect application of law. Accordingly, the bankruptcy court's conclusion that SR & Z was not a subsequent transferee is reversed.

C. *SR & Z's Defense to Subsequent Transferee Status Under § 550(b)(1)*

 SR & Z contends that if it is a subsequent transferee, it is entitled to the defense provided under § 550(b).[8] The bankruptcy court concluded that SR & Z would not be entitled to such a defense because it failed to establish each of the elements required under the statute. The bankruptcy court concluded that SR & Z satisfied the first two elements of the test but not the third. The court agrees.

The bankruptcy concluded that SR & Z had knowledge of the voidability of the transfer, and therefore, could not prevail on a defense under § 550(b)(1). SR & Z contends that it did not know that Southmark was going to file a petition for bankruptcy since all indications from Southmark was that bankruptcy was not in the company's future. The bankruptcy court, however, found that SR & Z knew facts that would lead a reasonable person to believe that the $3.3 million transfer to the

---

**8.** Under § 550(b), a trustee may not recover property from a subsequent transferee that 1) takes for value, 2) in good faith, and 3) without knowledge of the voidability of the transfer avoided. 11 U.S.C. § 550(b)(1).

Parks Group could be avoided as a preferential transfer if Southmark filed bankruptcy. The court cannot conclude that this finding by the bankruptcy court was clearly erroneous. Accordingly, the bankruptcy court's finding on this issue is affirmed.

D. *SR & Z's Qualification For A Claim In Southmark's Bankruptcy Case*

The bankruptcy court determined that if Southmark obtained a judgment against SR & Z, SR & Z could pursue a claim against Southmark in the bankruptcy case as a third-party beneficiary to the Settlement Agreement, as well as subrogee asserting a right of subrogation for unpaid legal fees. Southmark contends that SR & Z is not entitled to a claim in the Southmark bankruptcy case under either theory proposed by the bankruptcy court. The court agrees.

 When a trustee recovers property under 11 U.S.C. § 550, the subsequent transferee of a preferential transfer is authorized under § 502(h) to pursue a claim against the bankruptcy estate the same as if such claim had arisen before the date of the filing of the petition. 11 U.S.C. § 502(h). Southmark contends that SR & Z was never a creditor of Southmark. SR & Z does not dispute this contention, nor does it present evidence to establish that it was a creditor entitled to recover on a claim against Southmark before Southmark filed its bankruptcy petition. The court must, therefore, determine whether SR & Z could have nevertheless asserted a claim against Southmark under common law.

 The Settlement Agreement indicates that the parties to the agreement intended for the Settlement Agreement to be construed and governed in accordance with the laws of the state of New York. SR & Z contends that it is a third-party beneficiary of the reimbursement provision of the Settlement Agreement. An intended beneficiary of a contract may assert a claim under the contract as a third-party

beneficiary. *Mortise v. United States*, 102 F.3d 693, 697 (2nd Cir.1996). To pursue a claim as an intended beneficiary under a contract, a third party must establish that 1) no one other than the third party can recover if the promisor breaches the contract, or 2) the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party. *Piccoli v. Calvin Klein Jeanswear Co.*, 19 F.Supp.2d 157, 162 (S.D.N.Y.1998). SR & Z argues that the reimbursement provision of the Settlement Agreement establishes the parties intent for Southmark to pay SR & Z's legal fees. The court disagrees. The evidence establishes that Southmark agreed to reimburse the Parks Group for its costs and expenses, including legal fees, that it incurred in connection with the proxy contest and related litigation. Southmark establishes that it was unaware when it executed the Settlement Agreement that the Parks Group had not paid SR & Z's legal fees. There is no evidence by SR & Z that Southmark knew when it executed the Settlement Agreement that SR & Z's legal fees had not been paid. Once Southmark transferred the $3.3 million to R & P, Southmark's financial obligation to the Parks Group was satisfied. SR & Z's legal fees were incurred by the Parks Group. As such, the obligation to pay those fees rested with the Parks Group, and not Southmark. Had the Settlement Agreement stated that *Southmark* would *pay* rather than *reimburse* the Parks Group for its legal fees, SR & Z would be able to assert a claim under the Settlement Agreement as a third-party beneficiary. Since it does not, the court finds that the bankruptcy court erred in concluding that SR & Z would be able to assert a claim in the Southmark bankruptcy case as a third-party beneficiary of the Settlement Agreement. Therefore, the bankruptcy court's finding on this issue is reversed.

 The bankruptcy court also concluded that SR & Z would be able to assert a claim under the common law doc-

trine of subrogation. The doctrine of equitable subrogation is based on principles of equity and its purpose is to afford relief to those required to pay a legal obligation that ought, in equity and good conscience, to have been met by another. *Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 105–106 (2nd Cir.1992). In this case, SR & Z must return funds it received from Byron because those funds were the fruits of an avoided preferential transfer. Southmark contends that if SR & Z returns the $1 million it received from Byron. SR & Z would have a right to subrogation against the Park's Group—the party responsible for SR & Z's loss, not Southmark. SR & Z argues that if it must repay the $1 million, SR & Z can stand in the shoes of the Parks Group and assert a claim against Southmark based on the Parks Group's original claim for reimbursement of SR & Z's legal fees. SR & Z, however, was not a party to the Settlement Agreement, and presents no evidence that the Parks Group assigned any of its rights or claims under the agreement to SR & Z. Southmark contends that the doctrine of subrogation is not available to permit recovery against the original obligee, Southmark in this case. The court agrees. Accordingly, the bankruptcy court's finding that SR & Z could pursue a claim against Southmark in the bankruptcy case under the doctrine of subrogation is reversed.

The court finds that SR & Z cannot pursue a claim against Southmark in the bankruptcy case because SR & Z has failed that it could have brought a claim against the bankruptcy estate prior to the preferential transfer. At the time of the transfer, SR & Z was not a creditor of Southmark and Southmark owed no debt to SR & Z. Further, since SR & Z can neither establish that it was an intended

third-party beneficiary of the Settlement Agreement nor establish a right of subrogation, SR & Z may not pursue a claim against Southmark under either theory of law.

The bankruptcy court determined that any award of judgment that Southmark may obtain against SR & Z should be reduced by the dollar value of Southmark's dividend plan on a claim that SR & Z would assert against Southmark in the bankruptcy case. Since the court has determined that SR & Z may not assert a claim against Southmark in the bankruptcy case, the court will not use the bankruptcy court's calculations to reduce or offset any amount to which Southmark is entitled. Accordingly, the issue raised by SR & Z in its cross-appeal concerning the manner in which the bankruptcy court would have allowed Southmark to pay SR & Z's potential claim in bankruptcy is moot.

### E. Contemporaneous Exchange for Value Exception to Avoidance Under § 547(c)(1)

 SR & Z contends that the bankruptcy court erred in its Memorandum and Order dated March 24, 1997, when it determined that SR & Z was not entitled to a defense under 11 U.S.C. § 547(c)(1). Relying on the law of the case and the definition of "new value" as provided by the Bankruptcy Code,[9] the bankruptcy court concluded that the $3.3 million transfer from Southmark to the Parks Group was on account of an antecedent debt rather than a contemporaneous exchange for new value. SR & Z contends that the new value exchanged in this case was, *inter alia,* the Parks Group's agreement to vote its shares in support of Southmark's nominees to the board and agreement to not engage in another proxy contest or any

---

**9.** For purposes of a defense under § 547(c)(1), "new value" means: "money or money's worth in goods, services or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2).

other form of corporate takeover against Southmark. The bankruptcy court determined that this was not new value within the meaning of the bankruptcy code and found that Southmark was entitled to summary judgment on this issue. The court cannot conclude that the bankruptcy court's finding was clearly erroneous, and therefore affirms the bankruptcy court's conclusion on this issue.

### F. *Ordinary Course of Business Exception to Avoidance Under § 547(c)(2)*

■ In its Memorandum Opinion and Order dated August 13, 1997, the bankruptcy court found that SR & Z failed to establish that the $3.3 million preferential transfer from Southmark to the Parks Group was 1) in payment of a debt incurred in the ordinary course of business of the debtor and transferee, and 2) a transfer made in the ordinary course of business of the debtor and transferee.[10] Thus, the bankruptcy court determined that SR & Z could not prevail on a defense under 11 U.S.C. § 547(c)(2). In reaching its conclusion, the bankruptcy court found that proxy contests for corporate control do not occur in the ordinary course of business of a publicly held corporation, and that the proxy contest remains an extraordinary event in the business affairs of a publicly held corporation. The court cannot conclude that these findings by the bankruptcy court were clearly erroneous. Accordingly, the bankruptcy court's finding on this issue is affirmed.

### IV. *Conclusion*

For the reasons previously stated, the bankruptcy court's Final Order of Dismissal entered August 28, 1997, which is based on its Memorandum Opinion and Order entered August 13, 1997, is **reversed in part** and **affirmed in part.** Based on the court's findings and conclusions that

Southmark was a subsequent transferee of an avoided preferential transfer and that SR & Z is not entitled to a defense under 11 U.S.C. § 550(b)(1), Southmark is entitled to judgment in the amount of $1,000,-000 against Schulte, Roth, and Zabel, L.L.P., plus prejudgment and postjudgment interest.

■ The decision to allow prejudgment interest on an avoided preferential transfer is within the equitable discretion of the court. *Wilson v. First Nat'l (In re Missionary Baptist Found. of Am., Inc.),* 69 B.R. 536, 538 (Bankr.N.D.Tex.1987). When a transfer is avoided as a preference under 11 U.S.C. § 547(b), prejudgment interest accrues on any amount recovered pursuant to 11 U.S.C. § 550(a). *Slone v. Integra Bank/Pittsburgh (In re International Building Components),* 161 B.R. 764, 769 (Bankr.W.D.Pa.1993). Prejudgment interest begins to accrue from the date of demand for the return of the transferred property, or in the absence of a demand, from the date of the commencement of the adversary action. *Palmer v. Radio Corp. of Am.,* 453 F.2d 1133, 1140 (5th Cir.1971). The record on appeal reflects that Southmark filed its Second Amended Complaint for Avoidance and Recovery of Preferential Transfer on September 11, 1996. In that complaint, Southmark seeks to recover from SR & Z $1 million as an avoided preferential transfer. In its Memorandum Opinion and Order dated March 24, 1997, the bankruptcy court stated that Southmark did not narrow its demand on SR & Z to $1 million until September 1, 1996. Based on these facts, the court finds that prejudgment interest began to accrue on September 11, 1996. Accordingly, Southmark is entitled to recover prejudgment interest from and after September 11, 1996 at the applicable legal rate on such date.

SR & Z has also cross-appealed. For the reasons previously stated, the court

---

**10.** The bankruptcy court found that SR & Z established the third element of this defense—that the transfer be made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(C).

**affirms** the bankruptcy court's Final Order of Dismissal as it relates to SR & Z's defenses under 11 U.S.C. § 547(c)(1) and (2) as set forth in the bankruptcy court's Memorandum Opinion and Order dated March 24, 1997, and August 13, 1997.[11] Accordingly SR & Z's cross-appeal is hereby **dismissed.** Pursuant to Bankruptcy Rule 8016(a), the clerk of the court is hereby directed to "prepare, sign and enter the judgment" in accordance with this order. All costs of appeal shall be taxed against Schulte, Roth & Zabel, L.L.P.

11. In its Memorandum Opinion and Order dated March 24, 1997, the bankruptcy court found that SR & Z could not prevail on a defense under 11 U.S.C. § 547(c)(1) because it failed to establish that the $3.3 million transfer from Southmark to the Parks Group was a contemporaneous exchange for new value. In its Memorandum Opinion and Order entered August 13, 1997, the bankruptcy court found that SR & Z could not prevail on a defense under 11 U.S.C. § 547(c)(2) because it failed to establish that the same transfer was a payment made in the ordinary course of business or a transfer made in the ordinary course of business.